Slip Op. 12-140

## UNITED STATES COURT OF INTERNATIONAL TRADE

INTERNATIONAL CUSTOM
PRODUCTS, INC.,

                          Plaintiff,

            v.

UNITED STATES,

                          Defendant.

**Before: Gregory W. Carman, Judge**

Court No. 07-00318

[*Following bench trial, and upon the Court's finding that Customs unlawfully rate-advanced Plaintiff's merchandise, judgment is entered in favor of Plaintiff.*]

Eckert Seamans Cherin & Mellott, LLC (Gregory H. Teufel and Jeremy L. S. Samek) for Plaintiff.

Stuart F. Delery, Assistant Attorney General; Jeanne E. Davidson, Director; Barbara S. Williams, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Edward F. Kenny and Jason M. Kenner); Yelena Slepak, Office of the Assistant Chief Counsel, Int'l Trade Litigation, U.S. Customs and Border Protection, of counsel, for Defendant.

November 20, 2012

### OPINION & ORDER

CARMAN, JUDGE: Following a bench trial held from February 6, 2012 to February 10,

2012, this matter is now before the Court for findings of facts, conclusions of law, and

entry of judgment. Upon considering and weighing the evidence on the trial record, the

Court finds that Plaintiff, International Custom Products, Inc. ("ICP"), has proven that

*International Custom Products, Inc. v. United States*                    Page 2
Court No. 07-00318

the product it imported in the entry underlying this case, called "white sauce,"

conformed to a properly obtained binding ruling letter, D86228 (the "Ruling Letter"),

issued by the New York office of the Bureau of Customs and Border Protection ("CBP"

or "Customs") on January 20, 1999.  Because the Ruling Letter, which had not been

properly revoked, controlled the tariff classification of ICP's white sauce, the Court

finds that CBP acted contrary to law in liquidating the entry under a different tariff

classification associated with a much higher tariff rate.  As a consequence, the Court will

issue a partial final judgment pursuant to USCIT Rule 54(b),[1] requiring Customs to

reliquidate the single entry of Plaintiff's merchandise underlying this suit at the rate

established by the Ruling Letter and to refund to Plaintiff any overpayment with

interest as provided by law.

## I.  PROCEDURAL BACKGROUND OF CASE

Litigation between Plaintiff and the government over the liquidation rate of

entries of Plaintiff's white sauce has been ongoing since 2005.  It was on April 18, 2005

that Customs issued a Notice of Action which had as its result that 100 entries (the

---

[1] USCIT Rule 54(b) permits the Court to "direct entry of a final judgment as to
one or more, but fewer than all, claims" where the Court "expressly determines that
there is no just reason for delay."  The Court will avail itself of this procedure because
certain of Plaintiff's claims have been stayed on agreement of the parties until such time
as judgment has been issued on the claims decided in this opinion and all appeals have
been exhausted.  Further details are provided below.

"Affected Entries") of ICP's white sauce were reclassified under 0405.20.3000, HTSUS,

for "[b]utter and . . . dairy spreads," rather than as "[s]auces and preparations therefor"

under 2103.90.9091, HTSUS (the 2005 analog of 2103.90.9060, HTSUS, which was the

subheading provided for in the 1999 Ruling Letter).  The Notice of Action stated that

"action has been taken" to rate-advance the Affected Entries, and that in the future, "all

shipments of this product must be classified" under 0405.20.3000, HTSUS.  The

consequence of the reclassification was an increase of approximately 2400% in the duties

owed by ICP.  Since 2005, ICP has sought relief in various forms from the Notice of

Action.

## A.    Overview of ICP Cases

Customs's reclassification of ICP's white sauce has spawned a number of

lawsuits.  A brief overview of that litigation is appropriate here to provide the context

within which the current case arises.

### 1.    The 2005 Case

Challenges to tariff classification are typically brought before this court under

28 U.S.C. § 1581(a).  However, in its 2005 suit (Court No. 05-00341), ICP asserted

jurisdiction under the Court's residual jurisdictional statute, 28 U.S.C. § 1581(i)(4). The

Court may not exercise § 1581(i) jurisdiction when the plaintiff can access the court "by

traditional means, such as under § 1581(a)," unless "the remedy provided under

[subsection (a)] would be manifestly inadequate."  Thyssen Steel Co. v. United States, 13

CIT 323, 328, 712 F. Supp. 202, 206 (1989).  This Court determined that a suit brought

pursuant to § 1581(a) would be manifestly inadequate because ICP was challenging not

the "classification of its white sauce as enunciated in the Notice of Action," but rather

"the Notice of Action itself and Customs's authority to issue it."  International Customs

Products, Inc. v. United States, 29 CIT 617, 622, 374 F. Supp. 2d 1311, 1320 (2005)

("ICP I").  This Court also found that ICP's remedy under § 1581(a) would be manifestly

inadequate because the company would likely cease to exist due to the financial effects

of the Notice of Action before any § 1581(a) remedy could be obtained.  Id. at 1322.

    Having determined that jurisdiction under § 1581(i) was proper, this Court

proceeded to grant a motion by ICP for judgment on the agency record, declaring that

the Notice of Action was null and void because it was a "decision" that revoked the

Ruling Letter without following the notice-and-comment requirements for revocation of

ruling letters set forth in 19 U.S.C. § 1625(c).  Id. at 1325-30.  This Court found that

Customs must reliquidate the Affected Entries consistent with the Ruling Letter, which

this Court declared was still in force at the time the entries had been rate-advanced.  Id.

at 1333.

The Court of Appeals for the Federal Circuit ("CAFC") reversed this Court

regarding jurisdiction, holding that "the remedy provided by subsection 1581(a) is not

manifestly inadequate, and that therefore the Court of International Trade lacked

jurisdiction under subsection 1581(i)(4)."  International Custom Products, Inc. v. United

States, 467 F.3d 1324, 1327 (Fed. Cir. 2006) ("ICP II").  Due to the jurisdictional defect,

the CAFC vacated this Court's decision regarding the merits of ICP's arguments and

remanded the case for dismissal.  Id. at 1328.  Accordingly, this Court dismissed ICP's

2005 case.  International Custom Products, Inc. v. United States, 31 CIT 266 (2007)

(Judgment Order).

　　　　2.　　　The 2007 Case (the Current Case)

　　　In 2007, ICP timely filed this lawsuit, seeking, in essence, to raise the same

challenges to the Notice of Action that were raised in Court No. 05-00341, but on

§ 1581(a) jurisdictional grounds.  A plaintiff must protest before Customs the duties

imposed, have Customs deny that protest, then pay all imposed duties before bringing

suit in the Court of International Trade ("CIT") under § 1581(a).  Apparently because

Plaintiff could not afford to pay the 2400% increase in duties on the scores of Affected

Entries, Plaintiff protested and paid duties on a single entry, entry 180-0590029-7 ("the

Entry"), upon which it bases this suit.  The Entry was part of a group of 11 entries

brought into the United States in 2005 after the Notice of Action was issued.  Customs

liquidated the Entry at the higher rate provided in the Notice of Action on June 29, 2007

and ICP protested the liquidation on July 26, 2007 with a request for expedited

treatment.  The protest was deemed denied.  ICP paid the assessed duties by August 27,

2007 and filed this suit on August 28, 2007.

       3.     <u>The 2008 Cases</u>

Two other lawsuits filed by Plaintiff in 2008 are stayed pending the resolution of

the current case.  The first of these suits, assigned Court No. 08-00055, challenges as

unlawful certain actions Customs took after importation of the Entry in the instant case.

The precise content of that suit is immaterial here.[2]  <u>See</u> Compl., Court No. 08-00055,

ECF No. 4.  The second 2008 suit, assigned Court No. 08-00189, also addresses events

postdating the Customs actions challenged in the instant case and is immaterial here.[3]

<u>See</u> Compl., Court No. 08-00189, ECF No. 2.

---

    [2] Court No. 08-00055 challenges Customs's formal revocation of the Ruling Letter pursuant to the notice-and-comment procedures of 19 U.S.C. § 1625(c), effective January 2, 2006.  Those events postdate the events giving rise to the instant suit.

    [3] Court No. 08-00189 challenges on various grounds Customs's reclassification of 13 entries of ICP's white sauce in 2007.

The Court stayed all proceedings in Court No. 08-00055 and Court No. 08-00189

on October 29, 2008 and August 5, 2009, respectively.[4]

**B.      Prior Proceedings in the Current Case**

It will be useful to summarize here the prior opinions and proceedings of the

Court with regard to the current case, leading up to the trial.

On November 30, 2007, the government responded to the complaint with a

motion to dismiss for failure to state a claim upon which relief can be granted.  See

Motion to Dismiss, Court No. 07-00318, ECF No. 23.  The Court granted the

government's motion to dismiss as to two of ICP's claims.[5]  See International Custom

Products, Inc. v. United States, 32 CIT 302, 549 F. Supp. 2d 1384 (2008) ("ICP III").

However, the Court denied the motion to dismiss as to three of ICP's claims:  (a) Count

I, alleging that the 2005 Notice of Action was unlawful because it revoked the binding

Ruling Letter without going through the notice-and-comment revocation procedures

---

[4]  In Court No. 08-00055, the parties must file a joint scheduling order thirty days
following entry of final judgment, and the conclusion of any appeals, in the current
case.  Order, Court No. 08-00055, ECF No. 12.  Court No. 08-00189 is stayed until ten
days after entry of a final judgment in the current case.  Order, Court No. 08-00189, ECF
No. 47.

[5]  The dismissed claims alleged that Customs impermissibly modified the Ruling
Letter without a compelling reason, and that Customs's revocation of the Ruling Letter
constituted rulemaking conducted without notice and comment in violation of section
553 of the Administrative Procedure Act, codified at 5 U.S.C. §§ 553 et seq.

required by 19 U.S.C. § 1625(c)(1), and applied that revocation retroactively; (b) Count

II, making a similar allegation that Customs revoked a prior treatment of ICP's white

sauce in violation of notice-and-comment requirements provided by 19 U.S.C.

§ 1625(c)(2); and (c) Count V, alleging that Customs violated ICP's constitutional due

process rights when it revoked the Ruling Letter, depriving ICP of a property interest in

continued classification of its white sauce entries under the Ruling Letter absent notice

and an opportunity to comment pursuant to 19 U.S.C. § 1625(c).  Id.  In the course of

determining that Count I was not subject to dismissal for failure to state a claim upon

which relief could be granted, the Court held that the Notice of Action was an

"interpretive ruling or decision" within the meaning of 19 U.S.C. § 1625(c)(1) and "that,

if the actions alleged of Customs are proven, Customs effectively revoked ICP's

classification ruling by its conduct in connection with the white sauce importations."

ICP III, 549 F. Supp. 2d at 1393-94.  After the Court issued its decision on the motion to

dismiss, the government filed an answer to the complaint on April 14, 2008.  Answer,

Court No. 07-00318, ECF No. 44.

Plaintiff filed a motion for summary judgment on January 4, 2008 (Court No. 07-

00318, ECF No. 27), and the government filed a cross-motion for summary judgment on

September 26, 2008 (Court No. 07-00318, ECF No. 67).  The Court denied those motions

on January 29, 2009, finding that genuine issues of material fact precluded resolving the

case without a trial.  <u>International Custom Products, Inc. v. United States</u>, 33 CIT __,

2009 WL 205860 (2009).  In its opinion on the cross-motions for summary judgment, the

Court specifically found that jurisdiction in the current case was properly based upon

§ 1581(a) and extended only to the Entry (entry 180-0590029-7), but not to any of the

other 99 Affected Entries.  <u>Id.</u> at *3.

      The Court also identified in detail the issues of material fact preventing entry of

summary judgment.  First, the Court found that "there is a genuine issue of material

fact as to whether the actual goods Plaintiff imported conform to the description of

'white sauce'" in the Ruling Letter.  <u>Id.</u> at *5.  At issue was whether the white sauce in

the Entry contained xanthan gum or carboxymethylcellulose ("CMC") at all, and

whether it contained milkfat (interchangeably referred to as "butterfat") in

concentrations conforming to the Ruling Letter.  <u>Id.</u>  Second, the Court found that

"[w]hether or not Plaintiff made entries of 'white sauce' that . . . can serve as 'prior

treatment' for the purposes of 19 U.S.C. § 1625(c)(2), represents a genuine issue of

material fact."  <u>Id.</u> at *7.  Third, the Court found that judgment could not be entered

summarily on Plaintiff's Due Process claim because that claim relied on the alleged

violation of 19 U.S.C. § 1625(c)(1) as to which the Court had already indicated genuine

material issues of fact existed.  Id. at *8.  The government's cross-motion sought

summary judgment on the basis that ICP had made a material misstatement or

omission, by mischaracterizing the contents of white sauce and by failing to disclose

known typical uses and designations of white sauce, when applying for the Ruling

Letter.  Id.  The Court found that, although the government had presented "pertinent"

evidence on these issues, that evidence was insufficient to determine the issue as a

matter of law.  Id.

**C.      Bifurcation of the Current Case**

On August 4, 2010, the parties jointly moved to bifurcate trial of Plaintiff's

remaining claims in the current case into two phases, with Plaintiff's 19 U.S.C.

§ 1625(c)(1) claim and due process claim to be tried first and Plaintiff's 19 U.S.C.

§ 1625(c)(2) claim to be reserved and stayed for possible later trial, pending the outcome

of the first phase.  (Joint Motion to Sever (Bifurcate Trial), Court No. 07-00318, ECF No.

157.)  The Court granted this motion.  (Order of August 13, 2010, Court No. 07-00318,

ECF No. 158.)  For this reason, no evidence concerning Plaintiff's 19 U.S.C. § 1625(c)(2)

claim was taken during the present trial; that portion of Plaintiff's complaint remains

stayed at this time.

## II. PRETRIAL

After some additional motion practice, and a limited extension of discovery, the

parties submitted proposals for a pretrial order to govern trial of this case.  In doing so,

differences between the parties as to the admissibility of certain evidence arose.

## A.      Evidentiary Issues

Two evidentiary issues raised by the parties in the pretrial stage remain pending

before the Court.  First, Plaintiff sought an adverse inference that certain samples of

white sauce, destroyed while in the government's possession, contained ingredients

that conformed to the description of white sauce set forth in Plaintiff's ruling request.

(Pl.'s Mot. in Limine, Court No. 07-00318, ECF No. 172.)  The Court denied this motion,

but permitted Plaintiff to present evidence relevant to spoliation at trial and renew the

motion at the close of trial if Plaintiff wished to do so.  (Order of May 26, 2011, Court

No. 07-00318, ECF No. 190.)  Second, the Court deferred ruling on a motion by

Defendant (Def.'s Second Mot. in Limine and for Disqual., Court No. 07-00318, ECF No.

163) to exclude Plaintiff's counsel, Mr. Teufel, until such time as Plaintiff might actually

seek, at trial, to introduce testimony from Mr. Teufel.  (Slip Op. 11-60, May 26, 2011,

Court No. 07-00318, ECF No. 189.)

As for exhibits, those issues were resolved prior to trial, with the exception of

Plaintiff's Ex. 18.  After motion practice and discussions between the parties and the

Court as to the admissibility of paper exhibits and deposition transcripts, the parties

each moved in colloquy immediately prior to the beginning of trial to admit a particular

set of exhibits to which the other party did not object.  Upon consideration of the

consent of the parties and upon the Court's own consideration of the admissibility of

the exhibits, the Court admitted into evidence Plaintiff's Exhibits 1–7, 9, 12–13, 15–16,

19, 21, 23, 25–27, 30–34, 44, 50a–50ppppp, 51–59, 62–64, 66, 68–74, 77–78, 80–81, 85,

88–89, 93–94, 96, 98, 100, 105–107, 237, 242–243, 253, 255–258, 277, and 281–282; and

Defendant's Exhibits A–HH, KK–OO, and RR–DDD.  (Tr. 6–15; Pretrial Order, Court

No. 07-00318, ECF No. 235, Attachs. 1–5.)[6]  The Court took testimony regarding

Plaintiff's Ex. 18 (production "make sheets" from the files of the New Zealand-based

manufacturer of white sauce) and admitted that exhibit over Defendant's hearsay

objection.  (Tr. 195–197.)

---

[6] A color-coded chart of all proposed exhibits was incorporated into the Pretrial
Order in lieu of Pretrial Order Scheds. H-1 and H-2.  (Court No. 07-00318, ECF No. 235,
Attachs. 1–5.)  This chart marked each exhibit in either light or dark green (stipulated to
by the parties), yellow (status to be determined at the opening of trial), or red
(withdrawn by the parties).  The Court had indicated to the parties on the chart the
manner in which it intended to rule should a decision be required on the dark green or
red entries, but the necessity for the Court to issue those rulings was avoided by the
stipulations and withdrawals of the parties.

**B.      Pretrial Order**

A pretrial order in this case was entered on January 25, 2012.  (Pretrial Order,

Court No. 07-00318, ECF No. 235.)  Plaintiff and Defendant outlined the issues for trial

in their respective Pretrial Order Schedules.  (Pretrial Order, Court No. 07-00318, ECF

No. 235, Scheds. F1 and F2.)  To ensure that the relevant legal and factual issues were

properly framed prior to trial, the Court distributed an outline of relevant issues to the

parties at a pretrial conference on November 17, 2011, and the parties confirmed their

agreement.

1.      Issues for Trial

The principal issues to be decided are (1) whether the white sauce in the Entry

conformed with the Ruling Letter and (2) whether the Ruling Letter was invalid due to

material false statements or omissions made by ICP in seeking it.  (Id.)

As to whether the white sauce in the Entry conformed with the Ruling Letter,

there are two relevant questions: (a) did the white sauce in the Entry contain CMC and

xanthan gum, and (b) did the white sauce in the Entry contain between 72% and 77%

milkfat.  A subsidiary question is whether the Entry failed to materially conform to the

Ruling Letter if its milkfat content was above 77%.

As to whether the Ruling Letter is invalid due to material false statements or

omissions made by ICP, three questions are relevant: (a) did ICP fail to disclose its

knowledge as to the typical use of white sauce; (b) did ICP fail to disclose all the

commercial, common, and technical designations for white sauce; and (c) did ICP

mislead Customs as to the purpose of the ingredients in white sauce.  (Pretrial Order,

Court No. 07-00318, ECF No. 235, Sched. D2 at ¶ 2.)

    2.   <u>Uncontested Facts</u>

Certain basic facts regarding this case were agreed upon between the parties in

the pretrial order.  (Pretrial Order, Court No. 07-00318, ECF No. 235, Sched. C.)  Those

facts are as follows.  Dennis Raybuck is the President and founder of ICP, an importer

and distributor of dairy products, including white sauce, to manufacturers of food

products.  (<u>Id.</u> at ¶¶ 1–3.)  White sauce is a milkfat-based product that serves as the base

and can be an ingredient for products including, but not limited to, gourmet sauces,

salad dressings, processed cheeses, club cheese preparations, other sauces, and baked

goods.  (<u>Id.</u> at ¶¶ 4–5.)

In 1998, ICP sought a binding tariff classification ruling from Customs, stating in

its request that white sauce "may be used as the base for a gourmet sauce or salad

dressing" and "is the commercially recognized formulated sauce preparation which

serves as the base for production of gourmet sauces and dressings." (Id. at ¶¶ 6–8.)  A

specification sheet for white sauce, attached to ICP's ruling request, stated that white

sauce "has been properly acidified and contains all of the necessary thickeners and

emulsifiers needed for the further production of gourmet sauces and dressings," which

was given as white sauce's "[t]ypical usage." (Id. at ¶¶ 9–10.)  According to the

specification sheet, the "producer of gourmet sauces and dressings need only add the

proper flavoring compounds necessary for the production of their specific sauce or

dressing." (Id. at ¶ 11.)  The specification sheet also listed, under the heading "TYPICAL

ANALYSIS," milkfat content of 72%–77% and ingredients as "Milkfat, Water, Vinegar

(and/or lactic acid and/or citric acid), Zanthum [sic] gum, Carboxymethelcellulose [sic],

Sodium Phosphate and/or Sodium Citrate."[7] (Id. at ¶¶ 12–13.)  ICP also submitted a

sample of white sauce with the ruling request. (Id. at ¶ 15.)  Customs issued the Ruling

Letter on January 20, 1999, classifying the product described in the ruling request in

HTSUS 2103.90.90, providing for "[s]auces and preparations therefor; . . . : [o]ther:

[o]ther: [o]ther: [o]ther," with a duty rate of 6.6% ad valorem. (Id. at ¶ 16–17.)[8]

---

[7] "Zanthum gum" is an incorrect spelling of xanthan gum and
"Carboxymethelcellulose" is an incorrect spelling of carboxymethylcellulose, i.e., CMC.
Id. at ¶ 14.

[8] That tariff rate was reduced to 6.4% ad valorem in the 2005 HTSUS. (Id. at
¶ 18.)

Beginning in early 2000, ICP purchased property to build a manufacturing

facility, but production did not begin until the first quarter of 2005 due to a lawsuit and

sewer and zoning problems.  (Id. at ¶¶ 26–32.)

Customs tested three samples of ICP's imported white sauce between 2000 and

2007.  (Id. ¶ 34.)  In 2001, Customs requested the breakdown of a sample, asking "DOES

IT CONTAIN MILK OR CHEESE?"  (Id. at ¶ 36.)  The lab reported that the 2001 white

sauce sample contained 72.97% milkfat and concluded that "Fat and Moisture analyses

indicates [sic] that the sample contains 73% fat and 23% moisture which is consistent

with the information provided by the importer.  Information from the importer

indicates the sample contains 77% [milk]fat, 21% moisture, and 2% (Lactic acid,

zanthum [sic] gum, carboxymethelcellulose [sic], sodium phosphate and sodium

citrate)."  (Id. ¶ 37–38.)

A second white sauce sample was tested to verify the ingredient breakdown in

late 2004; two reports concluded that the milkfat content of this sample was

approximately 78%.  (Id. ¶¶ 39–41.)  Certificates of analysis for the entry from which the

2004 sample was taken indicate milkfat content of 77.3% and 78.1%, calculated using a

technique called the "by difference" method.  (Id. at ¶ 48.)  The data attached to the 2004

and 2005 reports on the 2004 sample list slightly varying percentages of both milkfat

and butyric acid (a measurement that allows for conversion of tested crude fat levels

into milkfat levels).  (<u>Id.</u> ¶¶ 42–47.)  The butyric acid levels given with the lab reports

lead to a calculation that more than 100% of the sample's crude fat consists of milkfat.

(<u>Id.</u> at ¶¶ 45–47.)

Customs sent a final white sauce sample for testing in 2007 in order to verify its

ingredient breakdown, specifically requesting that the ingredients on the specification

sheet be verified and that the lab determine whether the white sauce was an emulsion

(and if so, of what type).  (<u>Id.</u> at ¶¶ 51–52.)  For the 2007 sample, the lab determined a

milkfat content of approximately 76.58%, rounded up to 77% in the lab report, which

was 1.52% less than the milkfat percentage stated in the certificate of analysis

accompanying the entry.  (<u>Id.</u> at ¶¶ 53–56.)  The average lab findings of milkfat content

in the 2001, 2004, and 2007 samples was 75.84%.  (<u>Id.</u> at ¶ 58.)

On an unspecified date, ICP created for its main customer, Schreiber Foods

("Schreiber") (the company that purchased the Entry) a white sauce specification sheet

which did not list xanthan gum or CMC as ingredients.  (<u>Id.</u> ¶ 21–22.)

Customs liquidated the Entry under HTSUS 0405.20.30 on June 29, 2007; ICP

timely protested liquidation, the protest was deemed denied, and ICP paid the assessed

duties of $66,602.32 by August 27, 2007.  (<u>Id.</u> at ¶¶ 23–25.)

### III. TRIAL

The trial of this matter was held before the undersigned at the Court of

International Trade on February 6–10, 2012.

## A.    Trial Exhibits

As mentioned above, in colloquy at the commencement of the trial the Court

granted Plaintiff's unopposed motion to enter into evidence Plaintiff's Exhibits 1–7, 9,

12–13, 15–16, 19, 21, 23, 25–27, 30–34, 44, 50a–50ppppp, 51–59, 62–64, 66, 68–74, 77–78,

80–81, 85, 88–89, 93–94, 96, 98, 100, 105–107, 237, 242–243, 253, 255–258, 277, and

281–282; and Defendant's Exhibits A–HH, KK–OO, and RR–DDD.  (Tr. 6–15; Pretrial

Order, Court No. 07-00318, ECF No. 235.)  The Court heard testimony from Dennis

Raybuck, the CEO of ICP, that Plaintiff's Exhibit 18 contained production control sheets,

also called make sheets, from a plant run by ICP's New Zealand based white sauce

supplier.  (Tr. 103.)  Mr. Raybuck testified that he visited the plant at least once a year

and looked at make sheets during his visits.  (Tr. 105.)  Mr. Raybuck stated that shift

supervisors in charge of running the plant prepared the make sheets

contemporaneously with production, recording information within their direct

knowledge, and that the make sheets were kept in the regular course of business.  (Tr.

104-05.)  On voir dire, Mr. Raybuck stated that he examined the make sheets in batches

for approximately one hour during his visits to ICP's supplier's plants, did not

personally fill out the make sheets, never worked for or held an ownership interest in

the supplier company, and did not know what rules the supplier had regarding how the

make sheets were to be filled out.  (Tr. 105-09.)  The government moved to exclude

Plaintiff's Exhibit 18 on hearsay grounds, arguing that the make sheets were unreliably

filled-out and that Mr. Raybuck could not establish a business records exception

because he did not work for the white sauce supplier company.  (Tr. 109.)  The Court

admitted Plaintiff's Exhibit 18 into evidence under Federal Rule of Evidence 803(6), the

business record exception to the hearsay rule.  (Tr. 195-96.)  The Court found that Mr.

Raybuck was a qualified witness as to the regularity of the records, and his testimony

established that the make sheets were made at or near the time, by (or from information

transmitted by) someone with white sauce production knowledge and were kept in the

ordinary course of business as a regular practice.  (Tr. 196-97.)  The Court found that the

government's objection that the records were not filled out in a reliable manner went to

weight, not admissibility.  (Tr. 197.)

**B.      Trial Testimony**

Because the parties included many of the same witnesses on their witness sheets,

the Court allowed the witnesses to be called only a single time and gave the parties

latitude in their questioning.

Plaintiff called Dennis Raybuck, the president and CEO of ICP, as both a fact

witness and an expert witness (Tr. 92–463, 597–709, 817–23, and 1088–1117); Donald B.

Learmonth, an executive with Fonterra and associated companies that supplied ICP's

white sauce, as a fact witness (Tr. 465–502); Stanley Hopard, a former Customs National

Import Specialist who authored the Ruling Letter, as a fact witness (Tr. 503–75); Leslie

Aita, a Customs Import Specialist involved in the investigation that led up to Customs

issuing the Notice of Action, as a fact witness (Tr. 576–96); Alexander J. Costigan, former

owner of Level Valley Creamery, as a fact witness (Tr. 710–30); and Gerd Stern, the

former owner of companies that were early suppliers of ICP's white sauce, as a fact

witness (Tr. 730–64).

Defendant called Diane Kutskel, Mr. Raybuck's former assistant at ICP, as a fact

witness (Tr. 766–815); John G. McManus, director of purchasing for Schreiber Foods

from 1998–2004, as a fact witness (Tr. 832–69); Julian B. Heron, an attorney who

represented ICP in the past and who prepared the Ruling Request, as a fact witness (Tr.

870–85); Cheryl Glenzer, a former senior ingredients purchaser for Schreiber Foods

from 1989–2006, as a fact witness (Tr. 886–903); and Dr. Robert L. Bradley, Jr., a dairy

professor at the University of Wisconsin, as an expert witness (Tr. 904–1080).

## IV. FINDINGS OF FACT

Upon the trial record, the Court's consideration of the testimony taken, the

Proposed Findings of Fact submitted by the parties, and all other papers and

proceedings had in this matter, the Court hereby makes the following findings of fact.

**A.      Ingredients in the Entry**

The Court finds that the white sauce in the Entry contained CMC and xanthan

gum in functional amounts, and an actual milkfat content under 77%.

### 1.      CMC and Xanthan Gum

CMC and xanthan gum serve to thicken liquids. (Tr. 163.)  Mr. Learmonth and

Mr. MacBeth, employees of ICP's supplier, credibly confirmed that the supplier always

added CMC and xanthan gum to the white sauce it manufactured for ICP.  (Tr. 479; Pl.

Ex. 9 at 50-1.)  Mr. Raybuck provided ICP's supplier with the same specification sheet

for white sauce that was supplied to Customs with the Ruling Request (Tr. 225-26; Pl.

Ex. 2 at 3), and ICP instructed the supplier to include .2% CMC and .25% xanthan gum

so that the white sauce would contain thickeners in the middle of the functional range

(Tr. 203).  When Mr. Raybuck used the white sauce in his test kitchen, it always

thickened upon heating and otherwise acted in a manner consistent with containing

CMC and xanthan gum in effective quantities.  (Tr. 164-65.)  Numerous certificates of

analysis ("COAs"), make sheets, and other documents recording the regular procedures

of ICP's white sauce supplier regarding batches of white sauce produced in the period

leading up to manufacture of the Entry, as well as of the Entry itself, confirm the

presence of CMC and xanthan gum in the white sauce generally and in the Entry

specifically.  (Pl. Exs. 18, 31.)  The Court finds that Plaintiff established with this

evidence that the Entry contained CMC and xanthan gum in functional quantities.

The Court also finds that ICP created a business, Giuseppe's Finer Foods, to

create a line of gourmet sauces from white sauce, and credits Mr. Raybuck's testimony

that ICP would have made three to four times as much money at this business than it

made selling white sauce to Schreiber.  (Tr. 285-86.)  The record shows that ICP built a

facility for the manufacture of these sauces. (Tr. 285-86, 298-307; Pl. Ex. 258.)  The Court

finds ICP's actions consistent with a genuine intent to use white sauce in the manner

described in the Ruling Request, and further finds that removing CMC and xanthan

gum from white sauce would have prevented this use.  This provides a further basis for

the Court to credit Mr. Raybuck's testimony that CMC and xanthan gum were always

in the white sauce.

Although CMC and xanthan gum were removed from certain specification

sheets for ICP's white sauce (Pl. Ex. 21), Plaintiff established to the Court's satisfaction

that this change in documentation was merely an accommodation made to a customer,

and was not accompanied by a change in the actual ingredients of white sauce (Tr. 94-

100; Tr. 479; Pl. Ex. 9 at 50-1).  The Court also credits Mr. Raybuck's testimony that CMC

and xanthan gum were removed from the Schreiber specification sheets after ICP's

then-attorney, Mr. Heron, told ICP that changing the specification was permissible.  (Tr.

95, 100-01.)  Although the government called Mr. Heron and he was unable to recall the

consultation, the government never established that the consultation did not occur.  (Tr.

876-84.)  But regardless of the question of whether ICP made the specification sheet

change upon legal consultation, the Court finds that the stripping of CMC and xanthan

gum from the specification sheets was done at the request of ICP's principal customer,

Schreiber, for sales purposes, and was not accompanied by a corresponding stripping of

those ingredients from the white sauce in the Entry.

Dr. Bradley testified that CMC and xanthan gum were not present in effective

concentrations in the Entry.  (Tr. 944-45, 950-55.)  The Court finds that testimony to be

unreliable and unconvincing.

It is worth examining at this point the reasons that the Court finds Dr. Bradley to

have been an unreliable witness.  First, Dr. Bradley had financial motives to support the

government's position, as a long-term and frequent expert witness for the government.

(Tr. 963-69.)  The mere fact that hired experts ordinarily have financial interest in

providing useful testimony to their clients does not typically lead the Court to question

the usefulness of an expert's conclusions.  Dr. Bradley, however, attempted to

downplay the financial significance of his service as a government expert and the extent

of his ongoing involvement in such work.  (Id. (testimony of Mr. Bradley, in which he

stated that he only worked as an expert for the government "[t]hree or four days a year,

maybe, at the most," later admitted that he was also paid to act as a consulting expert in

many other cases, yet answered "[n]one" to the number of cases in which he had served

as a consultant but not testified).)  In addition, the Court finds that Dr. Bradley had a

partisan sympathy to the government's case that undercut the reliability of his expert

testimony.  (See generally Tr. 1031-35.)  Dr. Bradley declared, "I always maintain an

objective attitude." (Tr. 969.)  That declaration was belied by Dr. Bradley's later

testimony to the Court that ". . . [w]hen [ICP] went to get the ruling, they only had

gourmet sauces and dressings on the recommended uses . . . .  And then subsequently,

after talking with Schreiber, [ICP] amended that and added more uses . . . . if they had

gone for a ruling with all of those uses on, we might not be here today."  (Tr. 1035.)  Dr.

Bradley articulated a legal argument as to the inappropriateness of ICP's Ruling

Request during his testimony and, in doing so, a personal commitment to the

government's victory in this case.  Dr. Bradley's advocacy was highlighted by the

urgent manner in which he spoke from the witness stand.  Dr. Bradley was offered by

the government, and accepted by the Court, as an expert on "dairy processing, dairy

products, dairy testing" and "the use of pricing of butter and the pricing of white

sauce." (Tr. 940-41.)  Yet he exceeded the accepted scope of expertise to lecture the

Court with his legal opinion as mentioned above.  (Tr. 1035.)  Dr. Bradley's expertise

also did not include sauces or dressings, or the use or detection of CMC and xanthan

gum in such products, yet he provided testimony about those questions despite

admitting that he had no expertise in commercial sauce or dressing production. (Tr. 929-

31, 933-34, 940-41, 950-55, 974, 979-81, 1041-55, 1077-79.)  That testimony was not only

unhelpful, but also baseless.  Dr. Bradley had neither a basis as an expert for opinions

on such issues nor any factual basis for the opinions he expressed in those portions of

his testimony.  As a result, the Court finds Dr. Bradley's testimony about the amount

and function of CMC and xanthan gum in ICP's white sauce to be unpersuasive.

2.    <u>Milkfat Content</u>

The Court finds that the Entry contained milkfat in a concentration between 76%

and 77%.  Direct evidence on the milkfat content of the Entry exists in the COAs made

at the time the Entry was manufactured and shipped from the supplier.  (Pl. Ex. 27 at

ICP001393-94.)  The Entry consisted of 1120 cartons of white sauce, each weighing 25

kilograms.  (<u>Id.</u>)  The Entry contained 1099 cartons from a batch of white sauce with a

COA showing a milkfat content of 77.3%, and 21 cartons from a batch of white sauce

with a COA showing a milkfat content of 77.4%.  (<u>Id.</u> at ICP001390.)  This milkfat

percentage was calculated using the "by difference" method, which estimates milkfat

concentration by removing moisture from the sample and assuming that the remainder

is comprised solely of milkfat.  (Tr. 165-66 (Mr. Raybuck); Tr. 480-81 (Mr. Learmonth).)

"By difference" calculations overstate the actual milkfat content slightly, because it

lumps contents such as CMC, xanthan gum, and other additives in white sauce into the

milkfat percentage.  (<u>Id.</u>)  This is shown by Customs's own laboratory tests of ICP's

white sauce during the course of importation.  For example, the COA for one of ICP's

importations of white sauce showed a milkfat concentration, calculated "by difference,"

of 78.1% (Pl. Ex. 58), but testing by a Customs laboratory of a sample from that

shipment of white sauce showed an actual milkfat concentration of 76.6%, rounded up

for purposes of the lab report to 77% (Pl. Ex. 7).  A 2001 laboratory test by Customs had

similar results, determining actual milkfat concentrations of an ICP white sauce sample

to be more than 4% lower than the percentage "by difference" stated on the COA.  (Pl.

Ex. 4.)  In sum, the Court credits the exhibits and testimony that the "by difference"

method overstated milkfat concentrations in ICP's white sauce imports by at least .75%.

Consequently, the Court finds that the actual milkfat concentration of the white sauce in

the Entry was approximately 76.65%, and therefor fell within the range of "typical"

milkfat concentration for white sauce provided in the Ruling Letter.

        The Court also finds that, even if the Entry contained a milkfat concentration

slightly above 77%, as claimed by the government, the overage would be immaterial.

Evidence supporting this finding of fact is contained in the Customs laboratory reports

at Plaintiff's Exhibits 5-6.  These reports were issued in response to a request that the

laboratory test a sample of ICP's white sauce for classification and conformance with

the Ruling Letter.  (Id.)  While the Court agrees with Plaintiff that the test results contain

internal inconsistencies that make the conclusion as to actual milkfat content unreliable,

the reports nonetheless determined that white sauce samples containing 78% milkfat

conformed to the Ruling Letter.  (Id.)  Additionally, Mr. Hopard, who drafted the

Ruling Letter, testified that no specific milkfat concentration or range of concentration

was necessary for conformance with the Ruling Letter.  (Tr. 506-07.)  Mr. Hopard also

testified that, when the Customs laboratory determined that samples of ICP's white

sauce contained between 77% and 78% milkfat, Customs believed that "[i]t was

consistent" with the ingredients of white sauce as stated by ICP.  (Tr. 525.)  Thus the

Court finds that Customs believed that the Ruling Letter properly applied to ICP white

sauce even when that white sauce contained a milkfat concentration of 78%.

In sum, the Court concludes that the Entry physically conformed to the Ruling

Letter because it contained CMC and xanthan gum in functional quantities and

contained milkfat in an amount consistent with the typical range.

**B.      How the Ruling Letter Was Obtained**

As an affirmative defense, the government claimed that the Ruling Letter was

void ab initio because ICP made material misrepresentations and omissions when it

applied for the Ruling Letter.  Examining the record, the Court finds that ICP

adequately informed Customs of the typical uses of white sauce; the common,

commercial, and technical designations for white sauce; and the purpose of the

ingredients in white sauce when it applied for the Ruling Letter.  Therefore, the Ruling

Letter was valid at the time of the Entry and was not void <u>ab</u> <u>initio</u>, as claimed by the

government.

      1.     <u>Contents of the Ruling Request</u>

      As an initial matter, it is important to describe exactly what the Ruling Request

contained.

      First, the packet contained a letter to Customs dated December 21, 1998, stating

that ICP's white sauce "may be used as the base for a gourmet sauce or salad dressing"

and "is the commercially recognized formulated sauce preparation which serves as the

base for production of gourmet sauces and dressings."  (Pl. Ex. 2 at ICP000001.)

      Second, a specification sheet described white sauce by stating that it "has been

properly acidified and contains all of the necessary thickeners and emulsifiers needed

for the further production of gourmet sauces and dressings," which was given as white

sauce's "[t]ypical usage."  (<u>Id.</u> at ICP000003.)  Under the heading "TYPICAL

ANALYSIS," the specification sheet gave milkfat content of 72%–77% and ingredients of

"Milkfat, Water, Vinegar (and/or lactic acid and/or citric acid), Zanthum [sic] gum,

Carboxymethelcellulose [sic], Sodium Phosphate and/or Sodium Citrate."  (<u>Id.</u>)

      Next, two recipes incorporating white sauce were provided, one for "Gourmet

Hollandaise Sauce" and one for "Gourmet Salad Dressing."

Then, an October 1998 article in a food industry magazine entitled "Secrets to

Sauce Success" was included.  The article "Secrets to Sauce Success" quotes a Kraft Food

Ingredients employee, who describes the beginning stage of making a sauce this way:

> [Y]ou're going to make a white sauce, and the white sauce is just a
> thickening system. [. . .]  And you're going to build into that thickening
> system any special functionality you need, including flavor.  But if you're
> building a decent white sauce, it's going to have just about all the
> functionality you need.

(Id. at ICP000006.)  The article goes on to describe the use of stabilizers, such as xanthan

gum and CMC.  (Id. at ICP000006-10.)  Regarding the final stage, flavoring the sauce,

the article discusses the growing popularity of cheese-flavored and cheese sauces, and

mentions that "sauces can run the gamut from high-fat cheese-based and cream-based

sauces to nonfat gravies."  (Id. at ICP000011.)

The final two items in the Ruling Request were a physical sample of white sauce

and a price quote for white sauce from an Israeli supplier.  (Pl. Ex. 2 D, E.)

> 2.     Known Typical Uses of White Sauce

The Court finds that ICP provided adequate information regarding the principal

use of white sauce in the Ruling Request.

In its Ruling Request, ICP informed Customs in numerous ways that white sauce

was "the commercially recognized formulated sauce preparation which serves as the

base for production of gourmet sauces and dressings" and that it "may be used as the

base for gourmet sauce or salad dressing." (<u>Id.</u> at ICP000001) (emphasis added).  The

included specification sheet added the information that white sauce "has been properly

acidified and contains all of the necessary thickeners and emulsifiers needed for the

further production of gourmet sauces and dressings."  (<u>Id.</u> at ICP000003.)  Usage as a

"base sauce preparation for gourmet sauces and dressings" is described as typical.  (<u>Id.</u>)

The attached recipes gave specific examples of these typical uses, and the article made

clear that professionals in the sauce industry saw a "decent white sauce" as the basis

upon which any of a variety of different sauces could be made.  (Pl. Ex. 2 C.)  Mr.

Raybuck, who was qualified as an expert on sauce making, testified that manufacturers

of sauces and dressings had been creating an industrial version of white sauce since the

early 20th century and that he had seen this white sauce used in making hollandaise

sauce and vodka sauce.  (<u>See</u>, <u>e.g.</u>, Tr. 156-60.)  The Court credits this testimony and the

submissions in the Ruling Request, especially as the trade magazine article provides

strong independent corroboration for Mr. Raybuck's statements.  The Court therefore

finds that ICP accurately described the use of white sauce when it submitted the Ruling

Request to Customs.

The government pointed, however, to several ICP-produced specification sheets

for white sauce listing possible uses different from the principal use as a base for sauces

and dressings described in the Ruling Request.  The stand-out among these is an early

white sauce specification sheet ICP gave to Kraft Foods during business negotiations

shortly before ICP submitted its Ruling Request—negotiations that were never

consummated.  (Def. Ex. S.)  This specification sheet bears the date August 1, 1998 and a

fax header showing it was faxed to Kraft on October 7, 1998, about two and a half

months before ICP submitted its Ruling Request to Customs.  (See id., Pl. Ex. 2.)  It

describes white sauce as "the food product made from fresh cream and other high

quality ingredinets [sic] via a proprietary process . . . [and] used as a base sauce

preparation for any sauce or dressing that is in need of this particular taste profile."

(Def. Ex. S.)  Recommended usage is given as "an ingredient in baked goods and butter

based sauces."  (Id.)  This specification sheet, unlike all others in the record, contains a

disclaimer that reads, "[t]his information is presented for consideration in the belief that

it is accurate and reliable" but stating that "no warranty, either express or implied is

made . . . ."  (Id.)  Within days before ICP faxed Kraft this specification sheet, the two

companies entered into a "Confidential Disclosure Agreement" to share information

regarding a process ICP had developed to import a product and convert it into

anhydrous milkfat (AMF), and which Kraft wished to evaluate.  (Def. Ex. RR.)

Plaintiff submitted a collection of eleven specification sheets into the record, each

describing white sauce as "the commercially recognized formulated sauce preparation

which serves as the base for the production of gourmet sauces and dressings" and

indicating that "[t]ypical usage is as a base sauce preparation for gourmet sauces and

dressings."  (Pl. Ex. 21.)  These specification sheets are, in these regards, identical to the

specification sheet submitted by ICP with its Ruling Request.  (Compare Pl. Ex. 2

(Ruling Request) with Pl. Ex. 21.)  However, five of the specifications sheets in Pl. Ex. 21

include an additional sentence in the recommended usage section:  "Other uses include

processed cheese sauces, processed cheese and club cheese preparations."  (Pl. Ex. 21,

pages marked in lower right corner "LV1143," "080," "085," "275," and "0850.") The

Court finds that the specification sheets with the "processed cheese" language were

provided to customers on or after September 7, 1999.[9]  (Id.)  As such, these specifications

sheets were employed after the Ruling Letter had already been issued.

---

[9] Although many of the specification sheets are marked, incorrectly, with dates in 1998, those sheets contain fax headers showing when they were provided to Schreiber. None of the fax headers predates September 7, 1999.  The only specification sheet without a fax header bears a date from 2003.

Mr. Hopard credibly testified that, in issuing the Ruling Letter, he relied on the

accuracy of ICP's representations in the Ruling Request as to the principal use of white

sauce, as required by regulation.  (Tr. 549-50.)  Mr. Hopard examined the various

specification sheets for white sauce and testified that his decision would have taken into

consideration the alternative uses of white sauce given there, had those alternative uses

been disclosed.  (Tr. 555-65.)  During the government's examination of Mr. Hopard, he

was presented with a hypothetical question as to whether he would have classified

white sauce differently if he had seen all of the various uses referred to in the

specification sheets post-dating the ruling letter, and he answered that he would have.

(Tr. 565.)  However, Mr. Hopard later clarified that "if the greatest use in the United

States of this so-called white sauce was to make sauce preparations, then that would be

a factor in calling that the principal use" despite the other potential uses.  (Tr. 571.)

The "principal use" question was a central topic of Mr. Hopard's testimony,

since, as he repeatedly emphasized, the principal use of the class or kind of goods to

which a product belongs is "very critical" when classifying that product.  (See, e.g., Tr.

553.)  But the Court will perhaps be forgiven this observation:  deciding the critical

question of the classification of a good in a principal use provision of the tariff appears

to be an almost ineffable experience on a par with describing the sound of one hand

clapping.[10]  Mr. Hopard confirmed that the process contains two steps:  first, to identify

the class or kind of good to which the product in question belongs; and second, to

determine what the principal use of that class or kind of goods is.  (Tr. 519-20.)

        Mr. Hopard struggled, however, to articulate how the first step would be

conducted.  For example, he stated, "Well, class or kind is broad in scope . . . [and]

includes products that are . . . not necessarily identical, but have similar characteristics."

(Tr. 515-16.)  As to defining this in a particular case, "there are no definite steps," but it

is a "question of the type of product presented to you" and how it "relates to others you

have seen" or "other types of products you have done research on and so forth."  (Tr.

516.)  Class or kind is "broader and not just the product in front of you," which takes

some burden off the importer to be responsible for the actual use of a particular

importation.  (Tr. 541.)

        Furthermore, Mr. Hopard was unaware of the government ever having done any

class or kind determination with regard to white sauce.  (Tr. 516-17.)  To his knowledge,

no inquiries to any other sauce makers were made to determine whether or not white

---

    [10] This should not be taken as an indication that Mr. Hopard was not a credible
witness.  Overall, the Court found Mr. Hopard to be informative and helpful, with a
refreshing dedication to providing honest testimony evidenced in the way he fully
engaged the questions put to him and provided clear answers without shying away
from nuance during examination by the attorneys for both parties.

sauce was of the class or kind of goods used in the preparation of sauces.  (Tr. 521.) In

the absence of other evidence of a class or kind investigation, the Court finds that the

government never determined what class or kind of good white sauce belonged to.

As for the second step of a principal use determination, identifying the principal

use of the class or kind of good to which a product has been determined to belong,

principal use is "defined in the tariff" as "a use of a product that exceeds all other uses

. . . in the United States of the class or kind of good" to which the product in question

belongs.  (Tr. 515.)

Mr. Hopard described implementing that process in a manner that leads the

Court to find that it was more a matter of intuition that rigorous analysis. For example,

Mr. Hopard stated that "[y]ou decide it based upon the identity of the product, how it's

going to be used, where similar products have been used in industry and such.  <u>That's

kind of how you get the feel of that.</u>"  (Tr. 559) (emphasis added).  It is "a decision I

make based upon the facts presented to me and my knowledge of other types of

products that fall into that general category of good."  (Tr. 559-60.)  It is "based upon

what other independent research and knowledge you gain being on the job, you

discover certain similarities in types of products."  (Tr. 564.)  Mr. Hopard also testified

that, contrary to an actual use tariff provision, a primary use provision gives an

importer more leeway because the actual use of a particular entry is not determinative.

(See Tr. 541.)

After carefully considering all of the testimony from Mr. Hopard, the former

official who was responsible for conducting the analysis of principal use and drafting

the Ruling Letter, the Court finds that Defendant has failed to show that the Ruling

Letter was obtained by false information or material omissions from ICP regarding the

principal use of the class or kind of goods to which white sauce belongs.

3.      Common, Commercial, and Technical Designations for White Sauce

The Court finds that ICP provided Customs with adequate information about the

common, commercial, and technical designations for white sauce at the time at which

ICP applied for its ruling letter.  This has already been shown by the evidence

establishing that white sauce is used by manufacturers as a base for the creation of

sauces and dressings as described in, for example, the article included with the Ruling

Request.

Defendant's challenges on this issue point out that ICP failed to tell Customs in

the Ruling Request about alternative names used by other companies to refer to ICP's

white sauce.  Plaintiff does not contest that Schreiber referred to ICP's white sauce by a

Schreiber-chosen designation "CMF-403," incorporating the acronym for concentrated

milkfat.  (Tr. 622-23 (Mr. Raybuck).)  However, the Court finds no evidence in the

record that ICP provided paperwork to Schreiber using the CMF designation for white

sauce earlier than 2003 and therefore could not have informed Customs about that

designation in the 1998 Ruling Request.  (Pl. Ex. 2; Def. Ex. EE.)  The Court also finds

that ICP did not control the terminology employed by Schreiber, but merely complied

with its customer's request to use a preferred designation on paperwork when the two

companies did business.  (Tr. 622-23.)  It is also important to note that the name of a

product in a ruling request is "really not very important" and "is  not something that

has great weight" in determining classification, according to Mr. Hopard.  (Tr. 551-52.)

Therefore, the Court finds that ICP did not omit material information from the Ruling

Request by failing to tell Customs about other names used for white sauce.

    4.    <u>Purpose of the Ingredients in White Sauce</u>

The government contends that ICP designed white sauce as a vehicle to sneak

large amounts of milkfat into the US without paying the properly-applicable duties or

falling under the applicable quotas, and never intended to manufacture it into sauces or

dressings.  (Def.'s Post Trial Findings of Fact and Conclusions of Law at 19, Court No.

07-00318, ECF No. 251.)  The government's theory is that ICP therefor tried to maximize

the milkfat content of white sauce and minimize the other ingredients.

Contrary to the government's contentions, the Court finds that ICP genuinely

intended to use its imports of white sauce as a base for the manufacture of gourmet

sauces and dressings.  This is established by credible evidence on the record that ICP

created a subsidiary, Giuseppe's Finer Foods, intended to produce gourmet sauces and

dressings from white sauce.  (Tr. 132-35, 286.)  ICP also struggled through logistical

difficulties to build, at great expense, a large production facility at which it intended to

produce gourmet sauces and dressings (Tr. 286, 298-307, Pl. Ex 258).  ICP formulated an

Awesome Aussie Grilling Sauce and an Awesome Aussie Seafood Sauce, and had

discussions with both Outback Steakhouse and Red Lobster restaurants about

supplying those products.  (Tr. 285-86.)  Mr. Raybuck testified that, "had we been able

to accomplish that . . . we would have made about three or four times on [white sauce]

than what we were doing just selling it to someone else.  So that was always our interest

in doing that."  (Tr. 286.)  The Court credits Mr. Raybuck's testimony, and finds that ICP

genuinely intended to use its white sauce in the manner described in the Ruling Request

and allowed by the Ruling Letter.

Testimony from Diane Kutskel, who was subpoenaed and testified involuntarily,

implied otherwise.  (Tr. 765-815.)  Ms. Kutskel was Mr. Raybuck's only employee at ICP

for the first few years after its inception; she started as secretary and eventually handled

many varied administrative responsibilities.  (Tr. 768-69.)  According to Ms. Kutskel,

Mr. Raybuck "told me, because it always had to be kept very secretive, but he basically

told me that [white sauce] was just another way to bring in butter."  (Tr. 775.)  She also

claimed that Mr. Raybuck told her that ICP's $65 million production plant was built as a

cover for continuing to import white sauce.  (Tr. 798-99.)

   Two reasons that the Court does not credit Ms. Kutskel's testimony bear

discussing.  Firstly, Ms. Kutskel is an unreliable witness given that she and Mr. Raybuck

appear to have had an extremely bitter falling out over her abrupt termination from ICP

in 2003.  (Tr. 778-82.)  Ms. Kutskel denied holding a grudge or continuing to be angry

due to this falling out.  (Tr. 785, 814-15.)  But that denial was completely undercut by

Ms. Kutskel's demeanor, which alternated between sharp and tearful while testifying,

and made clear to the Court that the more than eight years between her severance from

ICP and her testimony had not resolved her ongoing anger and sadness toward Mr.

Raybuck.  (Tr. 780-82, 800-05.)  Secondly, and perhaps more importantly, the Court

finds that Ms. Kutskel did not make precise distinctions between the terms butter,

margarine, and white sauce in a manner according with the precise ways those terms

are understood within Customs law.  This sort of slipping from precise to casual

terminology by Ms. Kutskel in regard to white sauce is exemplified by a portion of her

testimony in which she admitted that she had freely intermixed the terms butter and

margarine when interviewed by a investigator from the Department of Homeland

Security Immigration and Customs Enforcement Bureau.  (Tr. 794-97.)  Due to this

tendency toward imprecise use of language and paraphrasing, the Court finds Ms.

Kutskel's testimony about butter and white sauce unreliable in resolving the legal issues

at hand.

     The Court has already found that the white sauce in the Entry conformed with

the Ruling Letter by containing xanthan gum and CMC in functional amounts and

milkfat within the typical range described in the Ruling Letter.  Consistent with those

findings, the Court finds no evidence in the record establishing that ICP removed any

non-milkfat ingredients from its white sauce.

     As to minimizing non-milkfat ingredients in white sauce, the government makes

much of a specification sheet ICP provided to Schreiber on which the ingredients

xanthan gum and CMC are not listed.  The government suggested, but did not

demonstrate, that ICP removed these ingredients from the white sauce entirely.

However, the Court credits Mr. Raybuck's testimony that he consulted ICP's then-

attorney, Mr. Heron (see supra, p. 23) and as a result believed that the FDA did not

object to removing CMC and xanthan gum from the Schreiber specification sheets on

the ground that they were present in small enough quantities that they need not be

mentioned for labeling purposes.  (Tr. 94-98.)

There is no credible evidence on the record from which the Court could conclude

that removing CMC and xanthan gum on a specification sheet for FDA labeling

purposes had any material relevance to the classification decision. Although Dr. Bradley

testified to the effect that CMC and xanthan gum were present in such small quantities

as not to be functional, this testimony is unpersuasive and outside Dr. Bradley's expert

competence as the Court has previously indicated.  (Tr. 944, 950-55.)

In any case, the Court finds that Schreiber's request to remove references to CMC

and xanthan gum from specification sheets was made shortly before October 5, 1999,

and thus post-dated the Ruling Request and could not have been anticipated and

disclosed at the time the request was submitted.  (Tr. 94-95.)

The Court has already found that the milkfat content of white sauce remained

between the 72% and 77% described in the specification sheet included with the Ruling

Request—a finding that runs counter to the government's suggestion that ICP

attempted to maximize the milkfat content of white sauce.  The government's view is

also inconsistent with the testimony of Mr. Hopard, who testified that the exact quantity

of fat in the white sauce, whether derived from milk or another source, was not

necessary for conformance with the Ruling Letter.  (Tr. 507.)  Additionally, Mr. Hopard

testified that "[i]ngredients for sauces are very, very varied" and can range "all over the

lot" and still be classified as a sauce preparation.  (Tr. 564.)  From this, the Court finds

that ICP could have simply submitted a request for white sauce to include more milkfat

in the first place, rather than obtaining a ruling for a lower amount and later

surreptitiously increasing it by as little as 1%.  To do so would simply make no sense.

### V. Post-Trial Submissions

Following the trial, the parties agreed to forego closing arguments and, in their

stead, to provide the Court with Proposed Findings of Fact and Conclusions of Law.

These were submitted on April 5, 2012 (Court No. 07-00318, ECF No. 250, by Plaintiff,

and Court No. 07-00318, ECF No. 251, by Defendant).

Thereafter, on June 6, 2012, the Court sent a letter requesting that the parties

provide briefs addressing the following issues: the manner of determining to which

class and kind of good a particular piece of merchandise belongs; classification of

merchandise under a principal use provision where (a) the product is used

commercially but has never previously been offered for sale, and (b) the product is a

new type of merchandise; the effect of evolution in the principal use of a class or kind of

merchandise on a binding ruling letter issued prior to that change; and the legal status

of an interpretive ruling or decision which effectively results in retroactive and

prospective refusal by Customs to abide by a binding ruling letter when that

interpretive ruling or decision is issued without the notice and comment procedures

required by 19 U.S.C. § 1625(c)(1).  (Letter Concerning Post-Trial Briefs, Court No. 07-

00318, ECF No. 253.)

The parties submitted their briefs on June 27, 2012 (Court No. 07-00318, ECF No.

255, by Plaintiff ("Pl.'s Post-Trial Brief"), and ECF No. 254, by Defendant ("Def.'s Post-

Trial Brief")).  On July 2, 2012, Defendant moved to strike certain portions of Plaintiff's

Post-Trial Brief.  (Def.'s Mot. to Strike, Court No. 07-00318, ECF No. 256.)  Plaintiff filed

an opposition on July 23, 2012.  (Court No. 07-00318, ECF No. 257.)  Defendant's Motion

to Strike remains pending before the Court at this time.

## VI. CONCLUSIONS OF LAW

### A.    Jurisdiction and Standard of Review

The Court has jurisdiction over Plaintiff's challenge to the liquidation of the

Entry underlying this case pursuant to 28 U.S.C. § 1581(a).  In such a case, the Court

makes its determination *de novo* upon "the basis of the record made before the court."

28 U.S.C. § 2640(a); Park B. Smith, Ltd. v. United States, 347 F.3d 922, 924 (Fed. Cir.

2003) (stating that the Court decides "civil actions that contest the denial of a protest"

on "a de novo basis.")

**B.      Conclusions of Law**

The Court now turns to legal conclusions that stem from the facts established in

the Court's findings.  There are four main legal issues before the Court.  First, the Court

must determine whether the Ruling Letter was void *ab initio* and therefore not binding

on Customs.  Second, the Court must determine whether the Ruling Letter, if valid,

applied to the Entry.  Third, the Court must determine whether the Notice of Action

violated 19 U.S.C. § 1625(c)(1) by effectively revoking the Ruling Letter with regard to

the Entry without first satisfying the notice and comment procedures specified in the

statute.  Fourth, the Court must determine whether Plaintiff is entitled to a remedy and,

if so, the nature of that remedy.

1.      <u>The Ruling Letter Was Not Void *Ab Initio*</u>

The Court concludes that the Ruling Letter was not void *ab initio* as the Court has

found as a matter of fact that it was not obtained by material misstatement or omission.

This issue arises from the CBP regulations that set forth what to include in

classification ruling requests and how Customs is to make its determinations in

response.  The regulations state that, "generally," "[e]ach request for a ruling must

contain a complete statement of all relevant facts relating to the transaction" and the

"transaction to which the ruling request relates must be described in sufficient detail to

permit the proper application of relevant customs and related laws."  19 C.F.R.

§ 177.2(b)(1)–(2)(i).  Specifically with regard to ruling requests seeking the proper

HTSUS classification of an import,

> the request for a ruling should include a full and complete description of the
> article and whenever germane to the proper classification of the article,
> information as to the article's chief use in the United States, its commercial,
> common, or technical designation, and, where the article is composed of two
> or more materials, the relative quantity (by weight and by volume) and value
> of each.

Id. § 177.2(b)(2)(ii)(A).  In addition, ruling requests

> must state whether, to the knowledge of the person submitting the request,
> the same transaction, or one identical to it, has ever been considered, or is
> currently being considered by any Customs Service office or whether, to the
> knowledge of the person submitting the request, the issues involved have
> ever been considered, or are currently being considered, by the United States
> Court of International Trade, the United States Court of Appeals for the
> Federal Circuit, or any court of appeal therefrom.

Id. § 177.2(b)(5).  As for how Customs decides such requests, CBP regulations provide

that Customs ruling letters are "[g]enerally"

> issued on the assumption that all of the information furnished in
> connection with the ruling request and incorporated in the ruling letter,
> either directly, by reference, or by implication, is accurate and complete in
> every material respect . . . .  [I]f the transaction described in the ruling
> letter and the actual transaction are the same, and any and all conditions

> set forth in the ruling letter have been satisfied, the ruling will be applied
> to the transaction.

Id. § 177.9(b)(1).

The Court has already found that ICP submitted the necessary material facts regarding white sauce—accompanied by an actual sample of the product—to Customs when seeking the Ruling Letter.  ICP also informed Customs of its belief that a prior ruling letter had been issued for white sauce, as required by § 177.2(b)(5).

The Court therefore concludes that ICP correctly followed the ruling request procedures set out in section 177.2 of Title 19 of the Code of Federal Regulations, and that the Ruling Letter issued by CBP was not void *ab initio*.

2.      The Ruling Letter Applied to the Entry

The Court concludes that the Ruling Letter applied to the Entry because the white sauce contained in the Entry materially conformed to the description in the Ruling Letter.

Ruling letters, when issued, apply to a particular class of merchandise:

> [e]ach ruling letter setting forth the proper classification of an article . . . will
> be applied only with respect to transactions involving articles identical to the
> sample submitted with the ruling request or to articles whose description is
> identical to the description set forth in the ruling letter.

Id. § 177.9(b)(2).

The Court has found that the white sauce contained in the Entry conformed to

the product described in the Ruling Letter and to the sample of white sauce provided to

Customs with the Ruling Request, and was therefore within the particular class of

merchandise to which the Ruling Letter applied.  The Court therefore concludes that

Customs violated its own regulation at 19 C.F.R. § 177.2(b)(2) when it decided not to

apply the Ruling Letter to the Entry, despite the conformance of the Entry.

       3.       <u>The Notice of Action in Effect Revoked the Ruling Letter Contrary to Law</u>

The Court concludes that the Notice of Action was tantamount to an interpretive

ruling issued contrary to law, as it had the effect of revoking the Ruling Letter without

the notice and comment procedures required by 19 U.S.C. § 1625(c)(1) by liquidating the

Entry under a different HTSUS subheading than specified in the Ruling Letter.

The Court has already held that the Notice of Action was an "interpretive ruling

or decision" within the meaning of 19 U.S.C. § 1625(c)(1) and that, subject to proof at

trial, Customs effectively revoked the Ruling Letter contrary to law by "its conduct in

connection with the white sauce importations." <u>ICP III</u>, 549 F. Supp. 2d at 1393-94.  The

Court here reaffirms this earlier determination and fully incorporates it into the current

opinion.  Having found that Customs rate-advanced the Entry without following the

procedures required by 19 U.S.C. § 1625(c)(1), the Court concludes that Customs acted

unlawfully.

    4.    <u>Plaintiff Is Entitled to a Remedy</u>

    As to the question of the appropriate remedy, the Court concludes that Plaintiff

is entitled to: (1) a declaration that the liquidation of the Entry contrary to 19 U.S.C.

§ 1625(c)(1) is void; and (2) a judgment requiring Customs to reliquidate the Entry at the

rate specified in the Ruling Letter and refund any excess duties to ICP with interest.

    It is important be mindful that the Court is not called on here to determine the

proper classification of ICP's white sauce <u>de</u> <u>novo</u>.  The Court is instead faced with the

question of whether Customs violated ICP's right to notice and comment procedures,

contained in 19 U.S.C. § 1625(c)(1), when Customs refused to apply a lawfully-obtained,

applicable Ruling Letter to the Entry.  Because the Court has determined that Customs

violated its legal obligation to classify the Entry according to the Ruling Letter, the

appropriate remedy is one tailored to cure that breach of law.  It is thus appropriate to

declare Customs's rate-advance of the Entry to be void, and to require that Customs

apply the Ruling Letter to the Entry as it should have done initially.  This can be

accomplished by requiring Commerce to reliquidate the Entry at the rate specified in

the Ruling Letter and to refund any overpayments, along with interest covering the

time of ICP's overpayment to the time the Court's judgment is satisfied.

## VII. REMAINING ISSUES

Several minor issues remain: Plaintiff's motion seeking an adverse inference

based on Defendant's alleged spoliation of a white sauce sample; Defendant's motion to

disqualify Plaintiff's counsel; and Defendant's motion to strike certain portions of

Plaintiff's Post-Trial Brief.

First, The Court need not reach the questions of whether Defendant spoliated

evidence or whether Plaintiff would be entitled to an adverse inference on that basis, as

the Court has concluded as a factual matter that the white sauce in the entry materially

conformed to the Ruling Letter on the basis of the trial record.  An adverse inference is

therefore unnecessary, and Plaintiff's motion is denied as moot.

Similarly, Defendant's motion to disqualify Plaintiff's counsel is denied as moot,

as Mr. Teufel did not testify or ask to testify at trial.

Finally, Defendant's motion to strike certain portions of Plaintiff's Post-Trial Brief

is granted.  In its Post-Trial Brief, Plaintiff referenced certain purported evidence that

Plaintiff attempted to introduce at trial and which the Court excluded by sustaining an

evidentiary objection from Defendant.  As such, these purported facts were not in

evidence and cannot be considered by the Court.  The Court therefore strikes the

references to these matters from page 9 of Plaintiff's Post-Trial Brief, and has ignored

this text in issuing this decision.

## VIII. Conclusion

For the foregoing reasons, the Court determines that:  (a) the Ruling Letter was

not obtained by material misrepresentation; (b) the Ruling Letter was therefore valid

and binding on Customs at the time of the Entry; (c) the white sauce in the Entry

materially conformed to the Ruling Letter; (d) Customs improperly liquidated the white

sauce contrary to the Ruling Letter by means of the Notice of Action; (e) the Notice of

Action had the effect of unlawfully revoking the Ruling Letter contrary to the

requirements imposed by 19 U.S.C. § 1625(c)(1), and (f) Plaintiff is therefore entitled to

reliquidation of the Entry at the rate established by the Ruling Letter.

Pursuant to USCIT Rule 54(b), "[w]hen an action presents more than one claim

for relief . . . the court may direct entry of a final judgment as to one or more, but fewer

than all, claims . . . only if the court expressly determines that there is no just reason for

delay."  The Court determines that Plaintiff is entitled to all of the relief it seeks based

on the outcome of its 19 U.S.C. § 1625(c)(1) claim, and that there is thus no just reason to

delay entry of judgment.

*International Custom Products, Inc. v. United States*                    Page 52
Court No. 07-00318

Because the Court finds that Plaintiff is entitled to full relief based on its 19 U.S.C.

§ 1625(c)(1) claim, the Court need not reach Plaintiff's due process claim or bifurcated

19 U.S.C. § 1625(c)(2) "prior treatment" claim at this time.  Those claims remain

dormant pending the outcome of any appeals.  Should the Court's judgment on the

19 U.S.C. § 1625(c)(1) claim be disturbed, Plaintiff may seek further relief  on its other

claims as appropriate.

Final judgment on the 19 U.S.C. § 1625(c)(1) claim will issue accordingly.

In accordance with the foregoing, it is hereby

**ORDERED** that Plaintiff's motion for an adverse inference based on spoliation of

evidence is denied as moot;

**ORDERED** that Defendant's motion to disqualify Plaintiff's counsel is denied as

moot; and it is further

**ORDERED** that Defendant's Motion to Strike portions of Plaintiff's Post-Trial

Brief is granted.


                                          __/s/Gregory W. Carman___
                                          Gregory W. Carman


Dated:   November 20, 2012
             New York, NY

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| INTERNATIONAL CUSTOM PRODUCTS, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>                    Defendant. |

**Before: Gregory W. Carman, Judge**

Court No. 07-00318

JUDGMENT

In accordance with the Court's Slip Opinion in this matter issued on this date, and upon the Court's express determination, pursuant to USCIT Rule 54(b), that there is no just reason for delay, it is hereby

**ORDERED, ADJUDGED, and DECREED** that the Bureau of Customs and Border Protection acted contrary to the requirements imposed by 19 U.S.C. § 1625(c)(1) in refusing to apply a binding ruling letter, D86228, to Plaintiff's merchandise in entry 180-0590029-7; and it is further

**ORDERED** that Customs reliquidate entry 180-0590029-7 at the tariff rate established by 2103.90.9091, HTSUS, as specified in ruling letter D86228; and it is further

**ORDERED** that Customs refund to Plaintiff any overpayment, with interest.

      /s/Gregory W. Carman
      Gregory W. Carman,  Judge

Dated:    November 20, 2012
             New York, New York