Slip Op. 15-68

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| INTERNATIONAL CUSTOM PRODUCTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Gregory W. Carman, Senior Judge <br><br> Court No. 07-00318 |

## MEMORANDUM AND ORDER

[Granting in part Plaintiff's application for fees and expenses under the Equal Access to Justice Act.]

Dated: June 24, 2015

Gregory H. Teufel, OGC Law, LLC of Pittsburgh, PA, for Plaintiff. With him on the brief was Jeremy L.S. Samek, Eckert Seamans Cherin & Mellott, LLC, of Pittsburgh, PA.

Edward F. Kenny and Jason M. Kenner, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With them on the brief were Joyce R. Branda, Acting Assistant Attorney General, and Amy M. Rubin, Assistant Director, International Trade Field Office.

Carman, Senior Judge:  Plaintiff International Custom Products, Inc. ("ICP"), an importer of a product known as white sauce, seeks an award pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d), of attorney's fees, expenses, and costs in this case. For the reasons explained below, the Court grants ICP's motion in part.

### BACKGROUND

At issue in this case were (1) the validity of a ruling letter issued by Customs and Border Protection ("CBP") to ICP, which established a classification of ICP's white sauce for tariff

purposes (the "Ruling Letter"), and (2) the propriety and impact of CBP's issuance on April 18,

2005 of a Notice of Action that classified all unliquidated and future entries of white sauce under

a tariff heading different from that provided in the Ruling Letter (and at a rate increase of

approximately 2400%). The procedural history of this case is long and involves a number of

intertwined actions between ICP and the government; the relevant background is laid out in some

detail in *Int'l Custom Prods., Inc. v. United States*, 36 CIT ___, 878 F. Supp. 2d 1329 (2012)

("*ICP III*"), familiarity with which is presumed.

In short, ICP applied to CBP for the Ruling Letter, classifying its white sauce under a

Harmonized Tariff Schedule ("HTSUS") heading for "[s]auces and preparations therefor." *See*

*ICP III*, 878 F. Supp. 2d at 1331. CBP issued the requested ruling in 1999. *See id.* On April 18,

2005, CBP abruptly changed course, issuing a Notice of Action that reclassified 87 already-

imported shipments of ICP's white sauce under an HTSUS provision for "[b]utter and . . . dairy

spreads," at a tariff rate approximately 2400% higher than the rate provided in the Ruling Letter.

*See id.* The Ruling Letter indicated that "action has been taken" to rate-advance the relevant

entries, and mandated that "all shipments of this product must be classified" under the butter and

dairy spread tariff provision in the future. *Id.*

ICP has been involved in litigation seeking to remedy the Notice of Action ever since. In

its initial case, brought in 2005, the Court found jurisdiction pursuant to 28 U.S.C. § 1581(i) and

granted judgment for ICP, but the judgment was reversed on jurisdictional grounds and the case

dismissed pursuant to a ruling from the Court of Appeals for the Federal Circuit. *See Int'l*

*Custom Prods. v. United States*, 29 CIT 617, 374 F. Supp. 2d 1311 (2005) ("*ICP I*"), *rev'd in*

*part, vacated in part*, 467 F.3d 1324 (Fed. Cir. 2006). ICP then filed a number of follow-up

cases. The present case stems from a group of 11 entries made by ICP shortly after the issuance

of the Notice of Action in 2005. In 2007, CBP liquidated those 11 entries pursuant to the rate

given in the 2005 Notice of Action, and ICP subsequently protested the liquidation by paying

penalties as to a single entry and initiating this suit. *See Int'l Custom Prods. v. United States*,

32 CIT 302, 304-05, 549 F. Supp. 2d 1384, 1388-89 (2008) ("*ICP II*"). This case was tried to the

bench in 2012 and resulted in a judgment for Plaintiff on the grounds that the Ruling Letter was

improperly revoked by the Notice of Action and that the white sauce at issue was therefore

liquidated at the wrong tariff rate. *See ICP III*, 878 F. Supp. 2d at 1331. The Court also found

that ICP obtained the Ruling Letter without materially misrepresenting the nature of white sauce,

and that the white sauce import underlying this case conformed to the description of the product

given in the Ruling Letter. *See id.* at 1350. The judgment was upheld on appeal, *International

Custom Products v. United States*, 748 F.3d 1182 (Fed. Cir. 2014) ("*ICP IV*"), after which

followed this fee application.

## STANDARD OF REVIEW

EAJA entitles a party who prevails in a civil action against the United States for, among

other things, judicial review of agency action to recoup its fees and other expenses—"unless the

court finds that the position of the United States was substantially justified or that special

circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).

Thus, in order to award fees and expenses, the Court must find that (1) the party seeking

the award was the prevailing party, (2) the position of the United States was not substantially

justified, (3) special circumstances do not make an award unjust, and (4) the application for fees

is timely and supported by an itemized accounting. *See Lizarraga Customs Broker v. Bureau of*

*Customs and Border Protection*, 35 CIT ___, ___, 2011 WL 4910421 at *5 (2011). The

government concedes that "ICP prevailed in this action," which is correct. Def.'s Mem. in Opp'n

to Pl.'s Application for Att'ys [sic] Fees and Expenses Under the Equal Access to Justice Act

("*Def.'s Mem.*"), ECF No. 274, at 6. ICP has filed an itemized accounting in support of its timely

fees application. *See* ECF No. 268 and attachments. What remains for the court is to determine

whether the position of the United States was substantially justified and whether special

circumstances make an EAJA award unjust.

 In determining whether the position of the United States was substantially justified, the

phrase "'position of the United States' means, in addition to the position taken by the United

States in the civil action, the action or failure to act by the agency upon which the civil action is

based." 28 U.S.C. § 2412(d)(2)(D). This includes arguments made by government attorneys

during the suit as well as the underlying actions of the relevant agency—here, the issuance of the

Notice of Action by CBP. *See Shah Bros., Inc. v. United States*, 38 CIT ___, ___, 9 F. Supp. 3d

1402, 1406 (2014) (citing *DGR Assocs., Inc. v. United States*, 690 F.3d 1335, 1340 (Fed. Cir.

2012)).

 The United States bears the burden of demonstrating that its position was substantially

justified by showing it was "*clearly* reasonable." *See id.* (citing *Libas, Ltd. v. United States*, 314

F.3d 1362, 1365 (Fed. Cir. 2003) and quoting *Gavette v. Office of Pers. Mgmt.*, 808 F.2d 1456,

1467 (Fed. Cir. 1986) (emphasis in original)); *see also Diamond Sawblade Mfrs. Coalition v.*

*United States*, 36 CIT ___, ___, 816 F. Supp. 2d 1342, 1356 (2012).[1] The statute states that

---

[1] The government acknowledges the allocation of the burden given in *Libas*, 314 F.3d at 1365,
but argues on the basis of cases from the Courts of Appeals for the Seventh and Eight Circuits

"[w]hether or not the position of the United States was substantially justified shall be determined

on the basis of the record . . . which is made in the civil action for which fees and other expenses

are sought." 28 U.S.C. § 2412(d)(1)(B). The government's position will be substantially justified

where it was founded on a "reasonable basis both in law and fact" and was "justified to a degree

that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 563-65 (1988).

Even where the position of the United States is "not correct," it can be justified; and it can be

"substantially" justified as long as "a reasonable person could think it correct." *Id.* at 566 n.2.

However, the standard for substantial justification is "slightly more stringent" than a simple

reasonableness standard. *Fakhri v. United States*, 31 CIT 1287, 1292, 507 F. Supp. 2d 1305,

1312 (2007) (citing *Spencer v. NLRB*, 712 F.2d 539, 558 (D.C. Cir. 1983)).

The Supreme Court states that the court must evaluate the substantial justification of the

government's pre-litigation and litigation conduct together, making only "one threshold

determination for the entire civil action." *Comm'r, Immigration & Naturalization Serv. v. Jean*,

---

that "a government case strong enough to survive either a motion to dismiss or a motion for
summary judgment is presumptively substantially justified." *Def.'s Mem.* at 7. The Court
declines to adopt the allocation of the burden preferred by the government. And although the
government notes there can be no "presumption that the Government's position was not
substantially justified simply because it lost the case," citing *Scarborough v. Principi*, 541 U.S.
401, 415 (2004), that principle does not prevent the government from bearing the burden of
*production of* a substantial justification (as opposed to the burden of *overcoming a presumption
against* substantial justification). The Court also notes the important rationale the Court of
Appeals for the Federal Circuit gave in *Gavette* for allocating the burden to the government: "the
reluctance of the courts to award fees prompted the adoption of the language in Rule 37 [of the
Federal Rules of Civil Procedure] on which this standard is based. Under these circumstances, it
is *particularly appropriate* to place the burden on the government to prove the reasonableness of
its actions. To do so encourages parties to contest action they believe to be unreasonable and
thereby serves to refine public policy." *Gavette*, 808 F.2d at 1456-66 (internal quotations and
citations omitted)(emphasis added).

496 U.S. 154, 159 (1990); *see also Chiu v. United States*, 948 F.2d 711, 715 (Fed. Cir. 1991)

(instructing trial courts to evaluate substantial justification on an overall basis that takes in "the

entirety of the government's conduct"). In making this evaluation, the court should consider the

"clarity of the governing law," or whether "the legal issue was novel or difficult." *Norris v. SEC*,

695 F.3d 1261, 1265 (Fed. Cir. 2012) (*per curiam*).

Special circumstances making a fee award unjust, even where the government is not

substantially justified, "have been recognized where the government unsuccessfully advanced

novel and credible legal theories in good faith." *Am. Air Parcel Forwarding Co. v. United States*,

12 CIT 850, 853, 697 F. Supp. 505, 507 (1988); *see also Shah Bros.,* 9 F. Supp. 3d at 1406. A

prior ruling against the government on the theory being advanced can detract from such a claim

being found novel. *See Fakhri*, 507 F. Supp. 2d at 1314. The special circumstances exception to

fee awards also "gives the court discretion to deny awards where equitable considerations dictate

an award should not be made." *Devine v. Sutermeister*, 733 F.2d 892, 895-96 (Fed. Cir. 1984)

(internal quotations and citations omitted).

**DISCUSSION**

**I.      Plaintiff is Entitled to EAJA Fees**

The Court finds that the position of the United States was not substantially justified and

that no special circumstance makes a grant of fees and expenses improper. As a consequence, the

Court finds that Plaintiff is entitled to recover fees and expenses pursuant to EAJA.

**A.      The Position of the United States**

The position of the United States includes actions taken by the relevant agency and also

litigation positions adopted by lawyers during the course of the lawsuit. Here, the agency actions

at issue are the actions taken by CBP prior to the filing of this lawsuit. The actions of the

Department of Justice, which defended this lawsuit in court, are also relevant to understanding

the government's position.

> 1.  <u>Whether the Ruling Letter Applied or Needed to Be Revoked</u>

CBP's issuance of the Notice of Action is the key action revealing CBP's position.

Issuing the Notice of Action had the effect of reclassifying ICP's white sauce at a vastly

increased duty rate in contravention of CBP's binding Ruling Letter, and CBP was fully

conscious that doing so could run afoul of the limitations in 19 U.S.C. § 1625(c), which require

notice and comment before revoking a ruling letter. *See* Compl., Ex. C, ECF No. 4-4 (containing

copies of communications between various CBP officials involved in the decision-making

process). So CBP engaged in significant deliberation as to the course of action it should pursue

before eventually issuing the Notice of Action. *See id.* For example, one memorandum recording

an August 2004 discussion indicates that the official who authored the Ruling Letter in 1999

"supports my position that, because of the binding Ruling Letter, we cannot just RA [rate-

advance] the recent entries . . . .  before we RA, we need to have the Binding Ruling revoked by

HQ [headquarters]." *Id.* at 66.

A high-level official at CBP sent an email on December 10, 2004 (the "December 2004

email") noting that he preferred to address changed facts regarding a product imported under a

ruling letter by issuing a new ruling, rather than by revoking the old ruling, because "[w]e do not

have the time to go through the [19 U.S.C. § 1625(c)] procedures." *Id.* at 290. However, he then

suggested that, given information CBP had obtained which it believed to indicate that the

principal use of white sauce was not the making of sauces, ICP's request for the Ruling Letter

"may even have been and probably was . . . fraudulent," and thus that he did *not* want to pursue

his ordinary course of issuing a new ruling in the case of white sauce, "for fear of unduly

complicating the agents [sic] case." *Id.* Although admitting that "generally we should correct the

earlier ruling"— issue a new ruling, or revoke the old one—"we also know it is not a perfect

world." *Id.* The conclusion reached was that "[i]f we do issue another ruling on the principal use

of the white sauce while I am here it will be after the criminal and civil penalties issues are

resolved, or it is determined at a later date that it is in the best interest of the Government's case

to do so or I am directed to do so by some higher authority." *Id.* This position won out, resulting

in the CBP rate-advancing ICP's entries without taking the time to first follow the procedures for

issuing a new ruling letter or revoking the old one.

A little over four months later, a CBP Director sent a brief letter continuing to warn about

the need for revocation proceedings before rate-advancing ICP's entries. On April 13, 2005

(three days before the issuance of the Notice of Action), this writer noted that ICP "is using the

HTS number we had provided in the ruling letter . . . . [b]ased on my experience, unless we can

demonstrate that the company committed fraud when requesting the ruling, OR&R [CBP's

Office of Regulations and Rulings] is going to have to revoke the ruling, issue public notice, and

give the company time to adjust their import practices . . . . I doubt [OR&R] will be very

supportive of a rate advance, when the company can claim they were relying on a ruling issued

by Customs." *Id.* at 192.

As it happened, OR&R took a different view and supported a rate advance via Notice of

Action without prior revocation of the Ruling Letter; OR&R maintained that "the Ruling Letter

should not be revoked because it was correct for the circumstances presented." *ICP IV*, 748 F.3d

at 1186. In OR&R's view, the Ruling Letter simply did not apply to ICP's white sauce imports,

past or future, "because those entries would be used to make cheese, not sauce." *Id.*

The Notice of Action characterizes CBP's position on the rate advance as a result of

laboratory testing: "CBP Lab analysis reveals that this product is a spreadable, water-in-oil type

emulsion with 78% milk fat. As such it will be properly classified under HTS 0405.20.3000"—

the dairy spread and butter tariff provision. Ex. 5, Pub. App'x in Supp. of Pl.'s Mot. for Summ. J.

and Pl.'s Opp'n to Def.'s Mot. to Dismiss, ECF No. 28-6 ("Notice of Action"). In other words,

CBP indicated in the Notice of Action that it was based on a claim that scientific analysis of the

physical makeup of the imported white sauce had revealed that it did not contain the same

physical ingredients as the white sauce described in the Ruling Letter. The Notice of Action does

not mention principal use, even though the Ruling Letter called for classification under a tariff

provision defined by the principal use of the class or kind of good to which the product belonged.

During litigation, the government expanded on the OR&R position, contending that the

Notice of Action did not "constitute an 'interpretive ruling or decision'" of the sort contemplated

by 19 U.S.C. § 1625(c), which covered only "documents like rulings, ruling letters, internal

advice memoranda, and protest review decisions"; the government argued that the Notice of

Action did not revoke the Ruling Letter and the protections of § 1625(c) (requiring notice-and-

comment before revocation of a ruling letter) were never triggered. *ICP II*, 549 F. Supp. 2d at

1390 (internal quotations omitted). *See also ICP IV*, 748 F.3d at 1187 (showing that the

government argued on appeal that "a Notice of Action is an entry specific document that . . . has

no effect on a prior policy or ruling by Customs") (internal quotations omitted). The government

also claimed that the Notice of Action did not revoke ICP's Ruling Letter because "stringent

procedures must be undertaken to revoke a ruling; unless and until Customs follows these

regulations, and revokes the ruling, the importer's ruling remains binding." *ICP II*, 549 F. Supp.

2d at 1393. Eventually, however, the government abandoned OR&R's position on appeal, and

conceded that "OR&R erred in finding the Ruling Letter did not apply to the white sauce

entries." *ICP IV*, 748 F.3d at 1186.

     In its opposition to ICP's fees application, the government argues that it was substantially

justified in taking the position that the Ruling Letter did not cover the entry, since the claim

survived a summary judgment motion, evidence at trial showed white sauce was being used in a

manner different than the Ruling Letter classification, and that white sauce was not commercially

recognized as a sauce and dressing base. *Def.'s Mem.* at 22.

              2.        Material Misrepresentation Allegations at the Court

     Second, the government claimed that ICP materially misrepresented the nature of white

sauce when it applied for the Ruling Letter. *See ICP III*, 878 F. Supp. 2d at 1335.[2] The material

misrepresentation claim focused on what information ICP provided about the principal use of

white sauce in its request for a Ruling Letter. *See id.* at 1342-43. Defendant claimed multiple

misstatements or omissions in ICP's application: (1) that white sauce was commercially

recognized; (2) the range of "typical uses" of white sauce; (3) what ingredients white sauce

contained and in what amounts; (4) omission of material information about white sauce's

commercial designation; (5) omission of information about ICP's prior importation of white

sauce; and (6) failure to inform CBP that white sauce was actually a method for importing butter.

---

[2]  This appears to be based on CBP's theory that ICP had committed "fraud," although no legal
allegations of fraud were brought against ICP.

*See Def.'s Mem.* at 11-22. These contentions stem from Customs regulations, which require

applicants for ruling letters to provide "a full and complete description of the article, and

whenever germane to the proper classification of the article, information as to the article's chief

use in the United States, its commercial, common, or technical designation," and a list and the

relative quantities of the components of any article made of more than one material. 19 C.F.R.

§ 177.2(2)(ii). A sample should be submitted, *id.* at § 177.2(3), as well as relevant documents if

"the ruling request directly relate[s] to matters set forth in any invoice, contract, agreement, or

other document," *id.* at § 177.2(4). The importer must also tell CBP whether, to the importer's

knowledge, "the same transaction, or one identical to it, has ever been considered or is currently

being considered" by CBP, or the courts. *Id.* at § 177.2(5).

ICP told CBP in its ruling request that the principal use of white sauce was "as the base

for production of gourmet sauces and dressings." *ICP III*, 878 F. Supp. 2d at 1342. The

government contended that ICP actually knew of other uses for white sauce but did not disclose

them. These claims were supported by ICP white sauce specification sheets listing the principal

use of white sauce as a sauce or dressing base, but providing "[o]ther uses" such as "an

ingredient in baked goods and butter based sauces" and "processed cheese sauces, processed

cheese and club cheese preparations." *Id.* at 1343. All of these specification sheets containing

other potential uses of white sauce, however, postdated the Ruling Letter.

A CBP witness established that classification in a principal use provision of the tariff

requires first that the class or kind of good to which the product belongs be identified, and then

that the principal use of that class or kind of good be determined (rather than the principal use of

the individual product at issue). *See id.* at 1344. The CBP official who issued the Ruling Letter

testified that, to his knowledge, CBP did not do "any class or kind determination with regard to white sauce." *Id.* In the absence of other evidence on this question, the Court found that "the government never determined what class or kind of good white sauce belonged to." *Id.* The Court also determined, based on the testimony of the CBP official responsible for issuing the Ruling Letter, that the process of determining the class or kind of good to which an article belongs was comparable to "describing the sound of one hand clapping." *Id.* Testimony established that there were no definite steps for determining the class or kind of merchandise, and that the goods within a class or kind must have similar characteristics, but need not be identical. *See id.* The class or kind of merchandise to which a product belongs is broader than the particular article under consideration. *See id.* Determining the principle use of a class or kind of merchandise is similarly "more a matter of intuition tha[n] rigorous analysis," conducted by "feel," based on facts submitted by the importer as well as on the CBP official's knowledge of similar goods that the official "gain[s] being on the job." *Id.*

### 3.   Conformance of White Sauce with the Ruling Letter

Third, the government also alleged that the white sauce contained in the relevant entry did not conform to the description of the product in the Ruling Letter. *See ICP III*, 878 F. Supp. 2d at 1335. The government's underlying position was that ICP designed white sauce as a method of sneaking milkfat into the United States while dodging high tariffs and restrictive quotas. *See id.* at 1345. The government theory was that ICP removed xanthan gum and carboxymethylcellulose ("CMC") (additives used to thicken and emulsify white sauce) while boosting milkfat content, in order to surreptitiously import higher quantities of milkfat. *See id.* At trial, production documents from the manufacturer of ICP's white sauce demonstrated that both

xanthan gum and CMC were present. *See id.* at 1338-39. The government's support for its

assertion that xanthan gum and CMC had been removed was a specification sheet ICP supplied

to a buyer, on which those ingredients were not listed. *See id.* at 1339. Three separate CBP

laboratory analyses of white sauce were conducted between 2000 and 2007, and the analyzed

product was found by the lab to be consistent with the description in the Ruling Letter. *See id.* at

1336-37. In any case, the amounts of xanthan gum and CMC in white sauce were small—less

than half of 1% of the total volume, according to the evidence. *See id.* at 1338. As for the milkfat

in white sauce, the Ruling Letter indicated a "typical" content of between 72% and 77%. *Id.* at

1336. The Notice of Action alleged that the content was actually 78%, and the government

asserted at trial that the product was therefore out of conformance with the Ruling Letter. *See id.*

at 1335. But CBP's own lab determined that samples calculated to contain 78% milkfat

conformed to the Ruling Letter, and the official who issued the Ruling Letter stated that no strict

milkfat concentration or range was required for conformance. *See id.* at 1341, 1347. From this,

the Court found that "Customs believed that the Ruling Letter properly applied to ICP white

sauce even when that white sauce contained a milkfat concentration of 78%." *Id.* at 1341.

On appeal, the government abandoned its contention that ICP's white sauce did not

conform with the Ruling Letter. *See ICP IV*, 748 F.3d at 1186 ("the Government concedes the

white sauce Entry materially conformed to the Ruling Letter, and that the Ruling Letter thus

applied to the Entry").

### B.      The Government's Position Was Not Substantially Justified

Considering the entirety of the record, pursuant to 28 U.S.C. § 2412(d)(1)(B), and the positions taken by the government as a whole, pursuant to *Jean*, 496 U.S. at 159, and *Chiu*, 948 F.2d at 715, the Court finds that the government's position was not substantially justified.

As we have seen, when CBP began investigating ICP's imports, a discussion occurred about whether white sauce entries could be rate-advanced without first revoking the Ruling Letter. Multiple officials at CBP saw an obvious nexus between a rate advance of the white sauce entries in a Notice of Action and revocation of the Ruling Letter and raised warnings about doing that. The record establishes that these warnings were not heeded.

The position that won out, explained in the December 2004 letter, was based not on complying with the legal restraints identified by others, but on expedience.[3] The December 2004 letter clearly indicates that revocation is the proper way to change the tariff rate of white sauce entries, but that CBP will not pursue that course because (1) "[w]e do not have the time" for revocation, (2) doing so might "unduly complicat[e]" an investigation of ICP, and (3) CBP will only follow the proper procedure with respect to ICP if "it is in the best interest of the Government's case to do." Compl., Ex. C, at 290. No reasonable person would approve of such a position.

---

[3]  CBP applied the Notice of Action to dozens of entries of white sauce that by all indications were materially-identical to the entry underlying this suit, resulting in astronomical duties. The Court of Appeals has conclusively established the illegality of the Notice of Action, and ICP's consequent entitlement to relief on the merits. Although that judgment is limited in formal effect to the single entry underlying this case, its rationale (and the illegality of the Notice of Action) appear to apply equally to all of the entries rate-advanced. The devastating scope of the Notice of Action does nothing to enhance its reasonableness.

In issuing the Notice of Action, CBP not only knew that it was effectively revoking the

Ruling Letter, but it unreasonably ignored the requirement that a ruling letter governs

liquidations until revoked. Although the government, for a time, insisted that the Ruling Letter

did not apply to the white sauce entries, we have seen that its own lab reports contradicted its

position. On appeal, the government conceded that "OR & R erred in finding the Ruling Letter

did not apply to the white sauce entries." *ICP IV*, 748 F.3d at 1186. The government's position

appears to be best characterized as an attempt to finesse its own requirements, which was not a

reasonable position upon which to base its actions.

Likewise, the Court finds unjustified the government's position that ICP materially

misled CBP into issuing the Ruling Letter. First, it bears mentioning that CBP's suspicion that

ICP committed "fraud" does not constitute support for this position. Similarly, the handful of

record references to a related criminal investigation by CBP agents gives this position no

support. All of these references in the record are simply speculation. The government did not

bring formal criminal charges of any type against ICP. Nor did the government formally allege

fraud in this case. Thus the rumors of potential fraud or criminality in the record are unfounded

and provide no justification.[4]

The government's position on material misrepresentation rests on the notion that ICP

misrepresented and omitted facts regarding the principal use of white sauce, such as its

commercial recognition, range of typical uses, and commercial designation. But these positions

---

[4]  This would be unremarkable except that the December 2004 letter centers its reasoning around
the notion that ICP committed fraud and that the Notice of Action should be pursued so as to
avoid interference with a potential criminal case.

are inconsistent with the testimony of CBP's official ("the NIS," for National Import Specialist) responsible for issuing the Ruling Letter. The NIS was unaware of CBP conducting the first step of its principal use analysis: determination of the class or kind of merchandise to which white sauce belonged.[5] CBP produced no evidence that, unbeknownst to the NIS, it conducted this analysis. Without such an analysis, it was unreasonable for CBP to decide that ICP's white sauce was not of the class or kind of merchandise typically used as a sauce preparation. CBP's position ignored the basic two-step process that CBP uses to determine principal use. Instead, CBP focused on the actual use of white sauce shipments. But the actual use of the shipments, under CBP's own rules, is not the deciding relevant concern for principal use classification.

Additionally, the government's laundry list of slight variations in specification sheets or potential uses of white sauce did not provide substantial justification for taking the position that the Ruling Letter was void or inapplicable to the white sauce imports. The record shows that these nearly all arose after the Ruling Letter had been issued, and were not of the type that a reasonable person would have believed material to the ruling. This is highlighted by the vague nature of the process for determining an article's principal use, attested by the NIS. The process is not regular enough to establish that such minor pieces of information should reasonably be considered material.

Finally, the government was not substantially justified in its argument that the white sauce failed to conform to the Ruling Letter. This position was belied by CBP's own multiple

---

[5]  As discussed, *supra* at § I.A.2., the process of determining classification under a principal use provision requires (1) determining the class or kind of good to which the product at issue belongs; and (2) determining the principal use of that *class or kind* of good (not the principal use of the particular product at issue).

laboratory tests, which reported that the tested samples conformed, and by the NIS testimony that

no specific percentage of milkfat content was required for conformance. CBP knew that ICP's

white sauce conformed to the Ruling Letter even if it contained the 78% milkfat stated in the

Notice of Action. *See ICP III*, 878 F. Supp. 2d at 1341 (finding that CBP "believed that the

Ruling Letter properly applied to ICP white sauce even when that white sauce contained a

milkfat concentration of 78%" based on statements made in the lab reports and at trial by a CBP

witness). The government also conceded on appeal that the white sauce conformed to the Ruling

Letter, a gradual process by which the government moved from defending its actions to

conceding error. *See Lizarraga*, 2011 WL 4910421 at *7 (stating "throughout this litigation,

Customs has progressively acknowledged" that the plaintiff of that case was entitled to the relief

he sought). This was not a position that would be justified to a reasonable person.

 The record, considered as a whole, establishes that the government position was rooted in

a desire to avoid the timely revocation process. At least in part, this was intended to clear a path

for a fraud or criminal investigation that never bore fruit. CBP knew at the time that revocation

could not properly be avoided, and yet CBP chose to proceed without revocation. The multiple

attacks on the Ruling Letter's validity and applicability stem from this effort. The government

position can thus best be summarized as an attempt to promote various post-hoc justifications for

taking action CBP knew to be improper. Considered as a whole, the government's position was

not founded on "a reasonable basis both in law and fact," "justified to a degree that could satisfy

a reasonable person." *Pierce*, 487 U.S. at 565 (internal quotations and citations omitted).

 Nor did the government's position stem from a lack of "clarity of the governing law," or

a "legal issue [that] was novel or difficult," such that it could be justified. *Norris*, 695 F.3d at

1265. To the contrary, the governing law was clear: a ruling letter must be applied unless and

until it is revoked following notice and comment procedures laid out in 19 U.S.C. § 1625(c).

This was acknowledged by CBP officials, including in the December 2004 letter. But CBP had a

goal in mind—rate advancing the ICP entries—that was inconsistent with the governing legal

framework. The position CBP adopted was an attempt to get around the applicable legal

framework. This was not a situation in which the government sought to solve a genuine dilemma

for which the law offered no easy resolution. A novel legal issue that serves as a post-hoc

rationalization for unjustified action is different from the kind of novel or difficult issue

referenced in *Norris*, which the Court finds inapplicable here.

### C.        No Special Circumstances Make an Award of Fees Unjust

The government argues that special circumstances make an award of fees unjust pursuant

to 28 U.S.C. § 2412(d)(1)(A). *Def.'s Mem.* at 22-23. The special circumstance asserted here is

that "[p]rior to the final decision by the Court of Appeals for the Federal Circuit in this case . . . it

was unsettled whether a CF 29 'Notice of Action' could be characterized as an 'interpretive

ruling or decision'" under 19 U.S.C. § 1625(c) such that it could trigger the notice and comment

procedures required for revocation of a ruling letter. *Id.* at 23. The government contends that

although it "did not ultimately prevail, in light of this unsettled area of law, an award of EAJA

fees is not appropriate." *Id.* at 24.

Although special circumstances "have been recognized" based on the novelty of a good

faith legal position adopted by the government, *Am. Air Parcel Forwarding*, 697 F. Supp. at 507,

the law does not mandate that the Court deny a fee award in all such cases. Indeed, as recognized

by *Fakhri*, the novelty of a position may be diminished where the government has presented that

position and lost previously. *See* 507 F. Supp. 2d at 1314. The determination of special

circumstances is for the Court to make within its discretion, keeping equitable concerns in mind.

*See Devine*, 733 F.2d at 895-96.

The Court finds no special circumstances here make an award inappropriate. As

previously discussed, CBP appears to have been aware that it was proceeding in an improper

manner in issuing the Notice of Action. The Court will not ratify such a position as raising

special circumstances, especially when doing so would have to rest in part on equitable grounds.

While it is true that the able government attorneys advanced a legal position that had never been

conclusively decided by the Court of Appeals, the novelty of the government's position was

diminished because this court rejected the argument once before, for the same reasons, before

this litigation began. *See ICP I*, 374 F. Supp. 2d at 1325-30.[6] But more importantly for the

question of special circumstances, the purely legal arguments about the nature of a Notice of

Action, pursued to final decision by the government's attorneys, do not appear to have been a

basis for the government's position at the time CBP issued the Notice of Action. The Court thus

finds that the government's positon here was a post-hoc attempt to justify a rate advance CBP

knew to be contrary to the governing legal framework at the time it was issued, and no basis for a

finding of special circumstances.

---

[6]  The Court notes that the portion of *ICP I* addressing this issue was vacated by the Court of
Appeals and therefore did not provide final resolution. *See Int'l Custom Prods. v. United States*,
467 F.3d 1324 (Fed. Cir. 2006).

## II.    The Amount of Fees Granted

Pursuant to 28 U.S.C. § 2412(d)(2)(A)(ii), "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." ICP requests a cost of living adjustment of the $125 per hour fee of its non-customs attorneys. *See* Pl.'s Application for Award of Att'y Fees and Expenses Under the Equal Access to Justice Act ("*Pl.'s Application*") at 17-18, ECF No. 268. The government does not object to the cost of living adjustment, which the Court will grant.

### A.    Special Factor Enhancement

ICP also requests a special factor enhancement for certain of its lawyers who are experienced attorneys with a specialized knowledge of customs law. *See id.* at 15-17. According to Plaintiff, this case "required the specialized skills in customs practice and litigation and knowledge of the customs laws and regulations and practices that are beyond what general practice attorneys would encounter." *Id.* at 16. Affidavits were submitted from attorneys with long experience in customs law, supporting the regularity of the rates charged and indirectly supporting Plaintiff's contention that "customs specialists are in short supply and that it would have been difficult to secure the services of less expensive, qualified customs specialists." *Id.* at 16-17, Ex. C., and Ex. D. The government opposes the special factor enhancement. *Def.'s Mem.* at 24-26.

Awarding a higher hourly rate than the statutory $125 per hour is appropriate where the claimant's attorneys possessed "some distinctive knowledge or specialized skill needful for the litigation in question—as opposed to an extraordinary level of the general lawyerly knowledge

and ability useful in all litigation." *Pierce*, 487 U.S. at 572. Although "cases involving customs

law are not automatically worthy of elevated attorneys' fees, a special factor fee enhancement

may be appropriate where specialized skills in customs law are both necessary and limited."

*Shah Bros.*, 9 F. Supp. 3d at 1410 (internal quotations and citations omitted); *see also Jazz

Photo*, 597 F. Supp. 2d at 1369 (finding "customs law to be a specialized practice area, distinct

from general and administrative law, for purposes of EAJA"). Plaintiffs have limited their

request for a special factor enhancement to the fees of those of ICP's attorneys with specialized

customs experience.[7] *Pl.'s Application* at 16.

      The Court finds that a special fact enhancement as requested is appropriate. To prosecute

its claims, ICP has required lawyers with skills only to be found in the small national cadre of

customs attorneys. ICP has also been required to defend against a series of highly technical

affirmative defenses asserted by the government, some of which the record shows to have

challenged even longtime CBP officials tasked with administering the customs law. The special

factor enhancement will be granted to the extent requested by Plaintiff.

      The exception to this is that no special factor enhancement can be applied to the

preparation of the EAJA fee application, which is not a matter requiring specialized customs

experience. The application is therefore denied to the extent Plaintiff seeks a special factor

---

[7] These attorneys are Simeon M. Kreisberg, Esq., Andrew A. Nicely, Esq., and Jeffery C. Lowe, Esq. *Pl.'s Application* at 16.

enhancement that augments fees for preparing its EAJA application.[8] *See Diamond Sawblades*, 816 F. Supp. 2d at 1362.

### B.    Reductions in Requested Fees and Expenses

The government argues that numerous specific items in ICP's request for fees and expenses[9] should be denied even if Plaintiff's application is granted. *See Def.'s Mem.* at 26-30 and *Addendum A* thereto. The government contends that many entries in the fee application should be eliminated due to "block billing" (i.e. attributing more than one attorney action to a single billing entry) and "quarter hour billing" (i.e., billing in minimum 15 minute increments) such as that employed by ICP's attorneys with the firm Mayer Brown. *Id.* at 26-27. (The items have been marked with a "B" in *Addendum A*.) The Court has examined the fees application and declines to reduce these entries. The block billing identified by Defendant does not lump together too many activities. Additionally, nothing in the EAJA application required minimum billing increments of a particular length. The fees billed in 15 minute increments are as valid and appropriate as those billed in six minute increments. The government's block billing contention is denied. Those fees marked with a "B" in *Addendum A* are to be paid (subject to any applicable exclusions or reductions discussed below).

---

[8]  This may have no effect on the amount of fees, as it appears that the entire EAJA application process involved attorneys for which ICP does not seek a special factor enhancement. *See Pl.'s Application* at Ex. B.

[9]  ICP's itemized accounting consists primarily of entries specifying attorneys' fees; there are also entries for litigation expenses, broken into the categories "Postage/Fedex," "Travel/Meals," "On-line Research, Library," "Filing Fees," "Phone/Fax," "Copies," and "Courier, Wire Transfer." *See* Addendum A to *Def.'s Mot.* ("*Addendum A*").

Next the government contests fees related to particular segments of the case: ICP's

application for a temporary restraining order and preliminary injunction,[10] over which the Court

determined it had no jurisdiction; and its motion for an order to show cause,[11] which the Court

denied. *Id.* at 27-28. The government is correct that these items are not compensable. *See Inner*

*Secrets/Secretly Yours, Inc. v. United States*, 20 CIT 210, 916 F. Supp. 1258, 1263 (1996) (citing

*Traveler Trading Co. v. United States*, 13 CIT 380, 385, 713 F. Supp. 409, 414 (1989)). The fees

request will be denied as to the entries associated with these two motions.

Similarly, the government notes that the action was extended and the filing of motions *in*

*limine* resulted due to ICP's failure to produce certain materials during discovery. *See Def.'s*

*Mem.* at 29-30. The government is also correct on this point, and these fees (marked with a "P"

in *Addendum A*) will therefore be denied. *See* 28 U.S.C. § 2412(d)(1)(C).

The government's remaining contentions are that certain billing entries are not clearly

related to the litigation,[12] too vague to determine their appropriateness,[13] and duplicative because

ICP's second attorney was reviewing the file to familiarize himself with the case.[14] *Def.'s Mem.*

at 27-29. The government also argues that ICP's entries for litigation expenses, although marked

under category headings such as "On-line Research, Library" and "Copies," are not described in

a manner that shows whether they related to the motions for which fees have been disallowed, or

---

[10]  These fee entries are marked "NJ" on *Addendum A*.

[11]  The fees related to the motion for an order to show cause are not marked in a unique manner
on *Addendum A*; instead, they are interspersed among the items marked "NR," a category that
also includes entries unrelated to the order to show cause.

[12]  These entries are marked "NC" on *Addendum A*.

[13]  These entries are marked "V" on *Addendum A*.

[14]  These entries are marked "D" on *Addendum A*.

are otherwise inappropriate. *Id.* at 30. In regard to these remaining contentions (i.e., the expense

entries and the attorneys' fee entries marked "NC," "V," and "D" in *Addendum A*), the Court

finds that it is appropriate to apply a blanket reduction of 33% to those entries. While the Court

agrees that certain entries include a quantity of work not clearly related to this case, or are too

vague, or involve duplicative work, the Court also finds that many of these entries involved

appropriate tasks. Where numerous entries in an EAJA application are problematic but not

wholly inappropriate, the Court may properly apply a fixed reduction, tailored to estimate the

extent of the deficiencies. *See Role Models America, Inc. v. Brownlee*, 353 F.3d 962, 973-74

(D.C. Cir. 2004) (finding that a "fixed reduction is appropriate" given a "large number of entries

that suffer from one or more . . . deficiencies") (internal citations omitted). Here, the Court finds

33% to be an accurate measurement of the extent of deficient or inappropriate fee entries marked

"NC," "V," or "D" (and which have not been previously eliminated on other grounds). These

entries will therefore be paid at 67% of the requested rates.

       With regard to the expenses ICP seeks, the Court finds that an amount of the requested

fees are related to motions for which the Court has found fees inappropriate. Although the

expenses are generally categorized, some expenses may also have been excessive or otherwise

inappropriate. The Court finds, however, that it would be unjust to deny all expenses on that

basis, given that Plaintiff without a doubt incurred most of its expenses in successfully pursuing

major litigation to overcome a government position that was not substantially justified. Mindful

of the need to reimburse Plaintiff's appropriate expenses without exceeding what is permissible,

the Court finds that a 33% reduction will balance these concerns and achieve a fair outcome. The

expenses sought by Plaintiff will therefore be paid at a rate of 67%.

### C.      Submission of a Recalculated Fees Application

Pursuant to the Court's above discussion of the fees and expenses to be granted, ICP is to revise its request for fees and expenses to leave out entries and reduce fees as stated in this opinion. The parties shall calculate the resulting amount, and submit a joint statement of the amount accompanied by a proposed order by July 31, 2015. *See Shah Bros.*, 9 F. Supp. 3d at 1414. Approval shall be summarily granted by the Court absent deviation from this opinion.

### CONCLUSION

For the reasons given above, the Court grants in part Plaintiff's application for attorneys' fees and expenses. It is therefore

ORDERED that a special factor enhancement apply to those fees payable for the work of ICP attorneys Simeon M. Kreisberg, Esq., Andrew A. Nicely, Esq., and Jeffery C. Lowe, Esq., with the exception of any work related to the application for EAJA fees; and it is further

ORDERED that a cost of living adjustment be made to the remainder of the attorneys' fees; and it is further

ORDERED that payment for fee entries marked "NJ" or "P" in *Addendum A* is denied; and it is further

ORDERED that payment for fees related to Plaintiff's motion for an order to show cause is denied; and it is further

ORDERED that payment for fee entries marked "NC," "V," or "D" on *Addendum A* (and not eliminated on other grounds) be made at a rate of 67% after any relevant special enhancement or cost of living adjustment; and it is further

ORDERED that payment of expenses be made at a rate of 67%; and it is further

ORDERED that the parties calculate the resulting amount and submit it to the Court via

ECF in a joint statement, accompanied by a proposed order, no later than July 31, 2015.


/s/      Gregory W. Carman
Gregory W. Carman. Senior Judge

Dated: June 24, 2015
       New York, New York